# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People ex rel. Madigan v. Illinois Commerce Comm'n**, 2013 IL App (2d) 120243

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE *ex rel.* LISA MADIGAN, Attorney General of the State of Illinois, Petitioner, v. ILLINOIS COMMERCE COMMISSION; NORTH SHORE GAS COMPANY; PEOPLES GAS LIGHT AND COKE COMPANY; VANGUARD ENERGY SERVICES, LLC; INTEGRYS ENERGY GROUP, INC.; INTEGRYS ENERGY SERVICES, INC.; PRAIRIE POINT ENERGY, LLC, d/b/a Interstate Gas Supply of Illinois, Inc.; ILLINOIS INDUSTRIAL ENERGY CONSUMERS; CITIZENS UTILITY BOARD; and THE CITY OF CHICAGO, Respondents.–CITIZENS UTILITY BOARD, Petitioner, v. ILLINOIS COMMERCE COMMISSION; NORTH SHORE GAS COMPANY; PEOPLES GAS LIGHT AND COKE COMPANY; VANGUARD ENERGY SERVICES, LLC; INTEGRYS ENERGY GROUP, INC.; INTEGRYS ENERGY SERVICES, INC.; PRAIRIE POINT ENERGY, LLC, d/b/a Interstate Gas Supply of Illinois, Inc.; ILLINOIS INDUSTRIAL ENERGY CONSUMERS; THE PEOPLE *ex rel.* LISA MADIGAN, Attorney General of the State of Illinois; and THE CITY OF CHICAGO, Respondents. |
| District & No. | Second District<br>Docket Nos. 2-12-0243, 2-12-0349 cons. |
| Filed | March 29, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The Illinois Commerce Commission's approval of a volume-balancing-adjustment rider, commonly known as Rider VBA, a rate design used to delink a utility's revenues from the volume of natural gas delivered to customers and intended to adjust customer prices in order to hold the revenues constant despite changes in consumption, did not violate the rules against retroactive ratemaking or single-issue ratemaking; therefore, the Commission's order was affirmed. |

| | |
|---|---|
| Decision Under Review | Petition for review of orders of Illinois Commerce Commission, Nos. 11-280, 11-281. |
| Judgment | Affirmed. |
| Counsel on Appeal | Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Paul Berks, Janice A. Dale, and Karen L. Lusson, Assistant Attorneys General, of counsel), for petitioner People *ex rel.* Lisa Madigan. |
| | Julie L. Soderna, of Citizens Utility Board, of Chicago, for petitioner Citizens Utility Board. |
| | John P. Kelliher, of Illinois Commerce Commission, of Chicago, for respondent Illinois Commerce Commission. |
| | Theodore T. Eidukas, of Foley & Lardner LLP, Mary Klyasheff, of Integrys Energy Group, Inc., and John P. Ratnaswamy and Carla Scarsella, both of Rooney Rippie & Ratnaswamy LLP, all of Chicago, and Bradley D. Jackson, of Foley & Lardner LLP, of Madison, Wisconsin, for respondents Integrys Energy Group, Inc., North Shore Gas Company, and Peoples Gas Light & Coke Company. |
| Panel | JUSTICE HUTCHINSON delivered the judgment of the court, with opinion. |
| | Justices Birkett and Spence concurred in the judgment and opinion. |

## OPINION

¶ 1    In this consolidated appeal, petitioners, Attorney General Lisa Madigan and the Citizens Utility Board (CUB), challenge the decision of the Illinois Commerce Commission (the Commission) approving a volume-balancing-adjustment rider with respect to the delivery of natural gas to residences and businesses in and around Chicago by respondents Peoples Gas Light & Coke Company (Peoples Gas) and North Shore Gas Company (North Shore) (collectively, the Utilities). Specifically, petitioners challenge the Commission's authority to impose revenue decoupling on the consumers of respondents' product, natural gas.

¶ 2        In March 2007, the Utilities petitioned the Commission to approve a new "tracker" rider, the volume-balancing-adjustment rider, called "Rider VBA." See *In re North Shore Gas Co.*, Nos. 07-0241, 07-0242, 2008 WL 631214, at *1. The Commission stated, "[i]n simplest form, Rider VBA would adjust customer prices *** in a way that the Utilities['] revenues are held constant despite changes in customer consumption." *Id.* at *127. The Commission reasoned:

> "Such changes in consumption are brought about by rising natural gas prices, the call for conservation measures, warming weather trends, the involvement of the Utilities in gas efficiency programs, and other events. The proposed monthly adjustments under Rider VBA are symmetrical meaning that they are based on both the over-recovery as well as the under-recovery of target revenues. Implementing Rider VBA imposes some additional administrative expenses and, among other things called for by Staff, there would be annual internal audits." *Id.*

Following an evidentiary hearing and a review of the materials, in 2008 the Commission approved Rider VBA as a four-year pilot program. *Id.* at *141.

¶ 3        The Attorney General appealed the Commission's decision; however, the Appellate Court, First District, determined that it lacked jurisdiction to consider the appeal and transferred the case to the Second District. See *People ex rel. Madigan v. Illinois Commerce Comm'n*, 407 Ill. App. 3d 207, 224 (2010). On January 10, 2012, and during the pendency of the appeal in the Second District, the Commission issued an order approving Rider VBA on a permanent basis. Thereafter, the parties moved to dismiss the appeal as moot, and this court allowed the motion. See *People ex rel. Madigan v. Illinois Commerce Comm'n*, No. 2-11-0380 (2012) (minute order).

¶ 4        In its January 2012 decision, the Commission set out the positions of the Utilities, the Commission's staff, and the Attorney General, and the response of the Utilities to the Attorney General's position. It then set out its analysis and conclusions. The Commission reflected that among the problems that Rider VBA was originally intended to protect the Utilities from were the revenue losses attributable to a diminishing customer base and to the implementation of aggressive energy efficiency programs. The Commission next expounded on the reasons to continue Rider VBA: it was "a symmetrical and transparent formula for collecting the approved distribution revenue requirement"; it would reduce reliance on forecasting, which was predictive and "inevitably incorrect"; and it would influence the Utilities to pursue fewer rate cases, because Rider VBA would make underrecovery of their revenue requirement less likely. The Commission addressed the criticism that questioned whether decoupling would prompt the Utilities to spend more on energy efficiency programs. It responded that its original approval of Rider VBA as a pilot program was not centered on energy efficiency factors and that energy efficiency was not the only reason it approved the decoupling mechanism. The Commission explained:

> "[O]ur rationale then and now is appropriately multi-faceted to address the many components that such a mechanism seeks to resolve. For example, weather affects customer usage and decoupling means that customers do not overpay when weather is colder than normal or underpay when weather is warmer than normal. Decoupling also

addresses load changes, including declining load attributable to energy efficiency. Whether Rider VBA prompts the [Utilities] to spend more on energy efficiency is immaterial. The [Utilities'] forecast showed declining load on their systems. Section 8-104 of the Act requires them to offer energy efficiency programs to meet ever-increasing load reductions through energy efficiency measures. Decoupling will take the effects of efficiency into account together with other factors, notably weather, that affects load and promote distribution rate stability for customers and the [Utilities]."

¶ 5 The Commission concluded that the benefits of "distribution rate stability for customers and the [Utilities]" justified approving the Rider VBA on a permanent basis. The Attorney General and CUB timely filed their notices of appeal.

¶ 6 Petitioners challenge the validity of Rider VBA and the Commission's discretion in authorizing it. Petitioners argue that the deferential standard that generally applies to the Commission's exercise of its discretion does not apply here because it "expressly departed from past practice" and it "necessarily abused its discretion if it made an error of law by approving a rider absent 'exceptional circumstances.' " In support of their argument, petitioners assert that (1) Rider VBA violates fundamental ratemaking principles by retroactively modifying consumer charges to meet revenue forecasts, and (2) Rider VBA violates the prohibition against single-issue ratemaking.

¶ 7 Contrary to petitioners' request for a more stringent review, our scope of review is governed by section 10-201 of the Public Utilities Act (the Act) (see 220 ILCS 5/10-201 (West 2010)). Section 10-201 provides in relevant part that a reviewing court shall reverse a Commission's order or decision, in whole or in part, if it finds that (a) the findings of the Commission were not supported by substantial evidence based on the entire record of evidence presented to or before the Commission for and against such order or decision; (b) the order or decision was without the jurisdiction of the Commission; (c) the order or decision was in violation of the state or federal constitution or laws; or (d) the proceedings or manner by which the Commission considered and entered its order or decision were in violation of the state or federal constitution or laws, to the prejudice of the appellant. 220 ILCS 5/10-201(e)(iv) (West 2010). This court gives "substantial deference to the decisions of the Commission, in light of its expertise and experience in this area." *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 405 Ill. App. 3d 389, 397 (2010) (*ComEd*). "Accordingly, on appeal, the Commission's findings of fact are considered *prima facie* true; its orders are considered *prima facie* reasonable; and the appellant bears the burden of proof on all issues raised." *ComEd*, 405 Ill. App. 3d at 397.

¶ 8 " 'In making adequate findings, the Commission is not required to provide findings on each evidentiary claim; its findings are sufficient if they are specific enough to enable the court to make an informed and intelligent review of its order.' " *People ex rel. Madigan v. Illinois Commerce Comm'n*, 2012 IL App (2d) 100024, ¶ 39 (quoting *ComEd*, 405 Ill. App. 3d at 398). " 'In other words, it must state the facts essential to its ruling so that the court can properly review the basis for the decision.' " *Id.* (quoting *ComEd*, 405 Ill. App. 3d at 398). "On review, this court can neither reevaluate the credibility or weight of the evidence nor substitute its judgment for that of the Commission." *Id.* ¶ 40 (quoting *ComEd*, 405 Ill. App. 3d at 398).

¶ 9    Section 9-101 of the Act requires the Commission to establish "just and reasonable" rates for consumers. 220 ILCS 5/9-101 (West 2010). In so doing, the Commission must also ensure that all of its rules and regulations affecting or pertaining to its rates are "just and reasonable." *Id.* With respect to ratemaking, at least two types are prohibited: those that constitute retroactive ratemaking and those that constitute single-issue ratemaking. See, *e.g.*, *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n*, 203 Ill. App. 3d 424 (1990) (retroactive ratemaking); *Citizens Utility Board v. Illinois Commerce Comm'n*, 166 Ill. 2d 111 (1995) (single-issue ratemaking). Retroactive ratemaking occurs when a utility establishes a scheme whereby it provides refunds to its consumers when its rates are too high and surcharges when its rates are too low. See *Illinois Bell Telephone Co.*, 203 Ill. App. 3d at 435 (citing *Citizens Utilities Co. of Illinois v. Illinois Commerce Comm'n*, 124 Ill. 2d 195, 207 (1988)). Single-issue ratemaking occurs when a utility considers changes to components of its revenue requirement in isolation in setting rates; this type of ratemaking is prohibited because considering any one item in a revenue formula in isolation risks understating or overstating the revenue requirement. See *Citizens Utility Board*, 166 Ill. 2d at 137. Petitioners assert that Rider VBA constitutes both retroactive ratemaking and single-issue ratemaking and that therefore the Commission's order should be reversed.

¶ 10    In the analysis and decision section of its 2008 decision, the Commission noted that the Rider VBA was "fundamentally different from any other rider that the Commission has authorized thus far and which the courts have approved." *In re North Shore Gas Co.*, 2008 WL 631214, at *128. Accordingly, prior to reaching the arguments, and relying on information from United States Department of Energy research reports and the testimony from the Commission's hearing, we provide a brief overview of natural gas revenue decoupling.

¶ 11    Some of a natural gas utility's expenses are for its "assets," such as distribution pipelines, mains, facilities, and equipment to maintain the utility's physical presence. See, *e.g.*, *People ex rel. Madigan v. Illinois Commerce Comm'n*, 2011 IL App (1st) 100654, ¶ 5 (describing infrastructure in relation to an " 'Infrastructure Cost Recovery Rider' "). Using our own hypothetical, we will say that this is 75% of its expenses. Then the remaining 25% of its expenses is the actual cost of preparing and distributing gas to its customers. Citizen "A" should not have to pay as much for natural gas to maintain the house at 65 degrees as Citizen "B," who maintains the house at 75 degrees. See, *e.g.*, 220 ILCS 5/1-102(d)(iii) (West 2010) (finding equitable that "the cost of supplying public utility services is allocated to those who cause the costs to be incurred"). For this policy reason, among others, rates traditionally have been structured so that citizens are paying a lesser fixed fee and a higher rate for their consumption of natural gas. However, if everyone in the service area suddenly uses only a fraction of the natural gas they used to use, the utility still has 75% of its expenses. Therefore, to continue to operate and profit, the utility must necessarily raise rates.

¶ 12    Ideally, the variable cost for citizens should equal the utility's cost to prepare and distribute the natural gas they consume, while the fixed cost should equal the total maintenance costs for the entire infrastructure divided equally among its customer base. Thanks to conservation and energy efficiency programs, the variable cost should be falling. As citizens become more energy conscious, consumption declines. In turn, the utility requests

a rate change. See, *e.g.*, 220 ILCS 5/9-201 (West 2010) (procedures relating to changing rates and hearings). In this hypothetical, the Commission approves the change, which effectively increases the fixed charge and lowers the variable consumption charge. Understandably then, the citizens are paying for infrastructure, not the consumption of natural gas. Legislative policies allowing this reaction to less demand essentially created little incentive for utility companies to shift their business model to invest in more energy efficient technology or programs to deal with less demand for their conventional service. To summarize then, revenue decoupling has not happened despite supply and demand; it has happened *because* of supply and demand.

¶ 13    In enacting section 8-104 of the Act, our legislature implemented a policy requiring natural gas utilities to use cost-effective energy efficiency measures to reduce direct and indirect costs to consumers. See 220 ILCS 5/8-104 (West 2010). Under traditional ratemaking, utilities are told to do one thing (promote energy efficiency) while they typically make more money when they do the opposite (increase sales). With traditional ratemaking, therefore, utilities experience a financial conflict of sorts when their efforts to reduce energy consumption are successful.

¶ 14    Revenue decoupling is a type of rate design that public utility commissions use to delink a utility's revenues from the volume of gas distributed (sales). With this type of regulation, a utility's revenues are essentially fixed by the public utility commission. If a utility's actual revenues are above the fixed level due to a larger volume of sales than expected, customers receive a credit from the utility for the difference; if actual revenues are below the fixed level due to a smaller volume of sales than expected, the utility issues a customer surcharge for the difference. Thus, a utility's revenues are decoupled from its volume of sales because its revenues are fixed as sales fluctuate. In other words, revenue decoupling is a regulatory mechanism that separates a utility's revenues from its level of sales by ensuring that the utility earns a reasonable and fixed level of revenues, even as sales fluctuate. See Sandy Glatt & Myka Dunkle, United States Department of Energy, Natural Gas Revenue Decoupling Regulation: Impacts on Industry (July 2010).

¶ 15    We, therefore, have two primary concepts. First, a traditional rate case uses a forecast of sales to set a rate, whereas revenue decoupling uses actual sales to set a rate. Because actual sales can be known only after the fact, revenue decoupling calculates an adjustment at a later date (called a "true-up calculation"). Second, a traditional rate case allows revenues to fluctuate around a fixed rate, whereas revenue decoupling allows a rate to fluctuate around a fixed level of revenues.

¶ 16    Decoupling was first introduced in 1978 in California to relieve the natural gas utilities of reduced revenues. To date, more than half of the states use or are considering natural gas revenue decoupling legislation. Each state and utility implements decoupling differently; however, the most common features used are as follows: both surcharges and credits issued; adjustments calculated and issued separately for different customer classes; adjustments based on the difference between actual and authorized revenues on a revenue-per-customer basis; a separate adjustment mechanism for weather; adjustments calculated annually; or surcharges and credits shown as a separate tariff page on a customer's bill.

¶ 17       In 2007, the Public Utility Commission of Ohio implemented revenue decoupling for Vectren Ohio. However, a few years later, the policy was replaced with another type of rate design called a straight fixed-variable (SFV) mechanism. See *Ohio Consumers' Counsel v. Public Utilities Comm'n of Ohio*, 127 Ohio St. 3d 524, 2010-Ohio-6239, 941 N.E.2d 757. An SFV mechanism is a nonvolumetric rate design that charges a flat monthly fee regardless of the volume of gas delivered. In the present case, the Commission considered, and then rejected, the SFV design in favor of Rider VBA.

¶ 18       Revenue decoupling has its advantages and disadvantages, and the Commission in the present case took evidence from the parties, which is reflected in detail in its 2008 and 2012 decisions. As it pertains to customers and utilities, revenue decoupling offers reduced volatility in the utility's revenues and in customers' bills; it provides more equity between customers and the utility because decoupling is based on actual revenues rather than estimates, thereby helping to remove the zero-sum game between customers and the utility; and significant energy conservation has the potential to cause a gradual decline in gas commodity prices as the overall demand is reduced. Disadvantages include customers' lack of understanding how decoupling serves their long-term interests when they experience surcharges in the short term; the delays in surcharges and credits on bills can dilute customers' perceived risk reduction from fluctuating energy bills; and volatility in utility revenues can be perceived as being in the rate payers' best interest–in other words, rate payers should benefit when weather is mild or they adopt energy conservation measures. As stated earlier, the Commission's 2012 findings and conclusions explained that Rider VBA was beneficial because, *inter alia*, it was "a symmetrical and transparent formula for collecting the approved distribution revenue requirement"; it would reduce reliance on forecasting, which was predictive and "inevitably incorrect"; and it would influence the utility companies to pursue fewer rate cases, because Rider VBA would make underrecovery of their revenue requirement less likely.

¶ 19       As noted, more than half of the states use or are considering natural gas revenue decoupling regulations. See Ralph Cavanagh, *Report: "Decoupling" Is Transforming the Utility Industry*, Switchboard, Natural Resources Defense Council Staff Blog, http://switchboard.nrdc.org/blogs/rcavanagh/report_decoupling_is_transform.html (last visited Mar. 14, 2013). Moreover, nearly every state has implemented some form of adjustment clauses or riders for its various utilities. For example, in April 2007, the New York State Public Service Commission determined that utility revenue decoupling mechanisms were needed, and it requested proposals to implement such regulations. See *In re the Investigation of Potential Gas Delivery Rate Disincentives Against the Promotion of Energy Efficiency, Renewable Technologies and Distributed Generation*, Case No. 06-G-0746.

¶ 20       Turning to the merits, petitioners first argue that Rider VBA violates the prohibition against retroactive ratemaking. Petitioners explain that all businesses must predict customer demand for their products; this is "fundamental to establishing price and thus fundamental to establishing just and reasonable rates that mimic market incentives." Petitioners claim that, under Rider VBA, "if customer gas usage differs from test-year projections, the Utilities add a monthly surcharge or credit to customer bills *the following year* to eliminate any deficiency

or surplus from the initial charge." Petitioners conclude that the surcharge or credit customers receive during the recovery period constitutes retroactive ratemaking.

¶ 21    Initially, the Utilities and the Commission (collectively, respondents) counter that petitioners' argument is forfeited because "nowhere in these documents *** did either the Attorney General or CUB raise a retroactive ratemaking argument before the Commission." First, we note that forfeiture is a limitation on the parties and not on the jurisdiction of this court. See *Central Illinois Light Co. v. Home Insurance Co.*, 213 Ill. 2d 141, 152 (2004). Second, the Commission's 2008 decision included a discussion of its staff's view of Rider VBA. See *In re North Shore Gas Co.*, 2008 WL 631214, at *116 ("According to Staff, Rider VBA takes the revenues that the rates approved in a base rate proceeding were intended to recover (which includes the Company's authorized return on rate base), and provides a surcharge if those rates produced insufficient revenues or a credit if those rates produced surplus revenues. In Staff's view, this is clearly contrary to the rule against retroactive ratemaking."). Third, the Commission rejected the argument. *In re North Shore Gas Co.*, 2008 WL 631214, at *133. Fourth, the Commission's 2012 order reflected the Attorney General's position that "Revenue Decoupling is Illegal Under Illinois Law" and addressed the "over- or under-recovery" of "costs being refunded or recovered through monthly adjustments." Despite the lack of the descriptive term "retroactive ratemaking," we believe that the argument was sufficiently raised to withstand forfeiture. For these reasons and in the interest of preserving a sound and uniform body of precedent, we choose to address petitioners' argument.

¶ 22    In *Mandel Brothers, Inc. v. Chicago Tunnel Terminal Co.*, 2 Ill. 2d 205 (1954), our supreme court first enunciated the rule against retroactive ratemaking. It determined that rates approved by the Commission as just and reasonable could not be "excessive or unjustly discriminatory" for the purposes of awarding reparations even if those rates were later reversed by a reviewing court. *Id.* at 208. The court's holding was based on the Act's requirement that a utility charge rates approved by the Commission throughout the appellate process unless the reviewing court stayed or suspended the new rates. *Id.* at 211. The court reasoned that, because the utility was required to charge rates set by the Commission, these rates could not be deemed to be excessive as a basis of a claim for reparations. *Id.* at 212. The court's holding was subsequently reaffirmed in *Independent Voters of Illinois v. Illinois Commerce Comm'n*, 117 Ill. 2d 90 (1987), *Citizens Utilities Co. of Illinois*, 124 Ill. 2d 195, and *People ex rel. Hartigan v. Illinois Commerce Comm'n*, 148 Ill. 2d 348 (1992).

¶ 23    The supreme court later described the concept of retroactive ratemaking: "Once the Commission establishes rates, the Act does not permit refunds if the established rates are too high, or surcharges if the rates are too low." *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 146 Ill. 2d 175, 243 (1991) (*BPI II*) (citing *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 136 Ill. 2d 192, 209 (1989) (*BPI I*)). The rule against retroactive ratemaking is consistent with the prospective nature of the Commission's ratemaking function and promotes stability in the ratemaking process. *Id.*

¶ 24    Although revenue decoupling is a different rate design from traditional ratemaking, the legal principles remain the same, *i.e.*, once the Commission approves a ratemaking plan, it

cannot later modify that plan to correct an error. In the present case, the Commission approved Rider VBA, which included a ratemaking plan of revenue decoupling. In approving Rider VBA, the Commission has not acted to correct any error. Rather, the Commission approved a design, which involved fixed and reasonable amounts of revenues for the Utilities and which involved a later true-up calculation based on actual sales. This two-tiered design was approved only once by the Commission and was not later modified. The Utilities' proposal of revenue decoupling through Rider VBA and the Commission's approval of it has not created a surcharge to compensate for low rates. Rider VBA provides the Utilities with a fixed level of revenue, not based on sales, that the Commission determined was just and reasonable. See 220 ILCS 5/9-101 (West 2010). This rate methodology was approved by the Commission and not added retroactively to cure a mistake. Accordingly, we conclude that the Commission's acceptance and adoption of revenue decoupling does not constitute retroactive ratemaking.

¶ 25      Next, petitioners argue that Rider VBA violates the prohibition against single-issue ratemaking. Petitioners assert that the rider is an "automatic adjustment" to existing rates that can change a rate without requiring the utility to delay recovery until it files a general rate case, thus distorting the ratemaking process. Petitioners argue that the sole purpose of Rider VBA is "to alter the Utilities' actual rate of return so that it matches forecasts from the test year." Petitioners continue, "[w]hen the Utilities' residential and small business revenues decline due to reduced gas usage, Rider VBA provides a monthly surcharge to improve the Utilities' bottom line" and "[w]hen income exceeds expectations, Rider VBA imposes a refund to reduce profits to those justified by test year projections." Petitioners conclude that, under Rider VBA, "consumer rates and company profits fluctuate based on a single strand in the overall revenue requirement, which is exactly what the rule against single[-]issue ratemaking seeks to prevent."

¶ 26      "The rule against single-issue ratemaking makes it improper to consider in isolation changes in particular portions of a utility's revenue requirement." *ComEd*, 405 Ill. App. 3d at 410 (citing *BPI II*, 146 Ill. 2d at 244). "The rule ensures that the utility's revenue requirement is based on the utility's aggregate costs and the demand on the utility, rather than on certain specific costs related to a component of its operation." (Emphasis omitted.) *Id.* "Often a change in one item of the revenue-requirement formula is offset by a corresponding change in another component of the formula. For instance, certain expenses for one aspect of a utility's business may be offset by savings in another area, thus removing the need for greater revenue." *Id.* "If rates are increased based solely on one factor, the ratemaking structure becomes distorted because there is no consideration of the changes to the other elements of the revenue formula, such as the operational savings from the improvements." *Id.* "Single-issue ratemaking is prohibited because it considers changes in isolation, thereby ignoring potentially offsetting considerations and risking understatement or overstatement of the overall revenue requirement." *Id.* at 411 (citing *Citizens Utility Board*, 166 Ill. 2d at 137).

¶ 27      In *ComEd*, this court recognized that because a rider, by nature, was a method of single-issue ratemaking, it was not allowed absent a showing of exceptional circumstances. *Id.* at 415 (citing *A. Finkl & Sons Co. v. Illinois Commerce Comm'n*, 250 Ill. App. 3d 317, 327

(1993)). After analyzing prior decisions, this court gleaned a guiding principle for testing a rider's validity:

> "[T]he Commission has discretion to approve a utility's proposed rider mechanism to recover a particular cost if (1) the cost is imposed upon the utility by an external circumstance over which the utility has no control and (2) the cost does not affect the utility's revenue requirement. In other words, a rider is appropriate only if the utility cannot influence the cost [citation] and the expense is a pass-through item that does not change other expenses or increase income [citation]." *Id.* at 414 (citing *Citizens Utility Board*, 166 Ill. 2d at 138).

¶ 28 Again, because revenue decoupling is a different rate design from traditional ratemaking, none of the cases that the parties cite is analogous to the present case. Therefore, Rider VBA is unlike other riders discussed generally in *ComEd*; that is, we decline to categorically find that Rider VBA is a method of single-issue ratemaking. Rider VBA does not provide for the recovery of any specific cost and it does not isolate any particular cost. *Cf. id.* at 409-15 (rejecting as single-issue ratemaking ComEd's proposed Rider SMP, a " 'system modernization project' " charge to customers, to immediately recoup the costs of modernizing its delivery system toward a " 'smart grid' "). Petitioners' conclusion that "consumer rates and company profits fluctuate based on a single strand in the overall revenue requirement" is inaccurate because, as we stated earlier, revenue decoupling is a rate design that a public utility commission uses to delink a utility's revenues from its sales, thereby fixing the utility's revenues. By approving Rider VBA in the present case, the Commission has determined the reasonable and fixed level of revenue for the Utilities, no matter how much or how little natural gas their customers use. Under Rider VBA, the Utilities' profits are part of the fixed revenue components that the Commission approved. Finally, unlike the types of riders discussed in *ComEd*, Rider VBA takes into account only those costs associated with the fixed revenue requirements that the Commission approved. Because Rider VBA is distinct from the types of riders discussed in *ComEd*, it is therefore not subject to *ComEd*'s requirements to establish its validity. See *id.* at 414.

¶ 29 The Utilities invested significant resources into the critical infrastructure necessary to distribute natural gas to customers' homes and businesses. This investment was approved long ago by the Commission. We conclude that the revenue decoupling mechanism known as Rider VBA was approved by the Commission to guarantee that the Utilities recoup the costs for the infrastructure in which they prudently invested, not to ensure profits but to satisfy the distribution needs of their customers.

¶ 30 We hold that Rider VBA did not violate either the rule against retroactive ratemaking or the rule against single-issue ratemaking. We further hold that the findings of the Commission were supported by substantial evidence. See 220 ILCS 5/10-201(e)(iv) (West 2010). Therefore, for the foregoing reasons, we affirm the order of the Commission.

¶ 31 Affirmed.