# Illinois Official Reports

## Supreme Court

*People ex rel. Madigan v. Illinois Commerce Comm'n,*
**2015 IL 116005**

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE *ex rel.* LISA MADIGAN *et al.*, Appellants, v. ILLINOIS COMMERCE COMMISSION *et al.*, Appellees. |
| Docket No. | 116005 |
| Filed | January 23, 2015 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The Illinois Commerce Commission did not abuse its discretion in allowing to become permanent a four-year pilot program for a volume-balancing-adjustment rider imposing "revenue decoupling" on natural gas utility customers, thereby stabilizing both utility revenues and customer bills. |
| Decision Under Review | Appeal from the Appellate Court for the Second District; heard in that court on a petition for review of orders of the Illinois Commerce Commission. |
| Judgment | Affirmed. |

Counsel on Appeal

Lisa Madigan, Attorney General, of Springfield (Carolyn E. Shapiro, Solicitor General, and Brett E. Legner and Karen L. Lusson, Assistant Attorneys General, of Chicago, of counsel), for the People.

Julie Soderna, of Citizens Utility Board, of Chicago, for appellant Citizens Utility Board.

Foley & Lardner LLP (Theodore T. Eidukas, of Chicago, and Bradley D. Jackson, of Madison, Wisconsin), John P. Ratnaswamy and Carla Scarsella, of Rooney Rippie & Ratnaswamy LLP, and M. Gavin McCarty and Mary Klyasheff, all of Chicago, for appellees Peoples Gas Light and Coke Company and North Shore Gas Company.

John P. Kelliher, Special Assistant Attorney General, of Chicago, for appellee Illinois Commerce Commission.

John E. Rooney and Anne W. Mitchell, of Rooney Rippie & Ratnaswamy LLP, of Chicago, for *amicus curiae* Northern Illinois Gas Company.

Whitt Sturtevant LLP (Albert D. Sturtevant, of Chicago, Andrew J. Campbell, of Columbus, Ohio) and Edward C. Fitzhenry, of St. Louis, Missouri, for *amicus curiae* Ameren Illinois Company.

Gerard T. Fox, of Chicago, and Kevin Belford and Michael Murray, of Washington, D.C., for *amicus curiae* American Gas Association.

Justices

JUSTICE THEIS delivered the judgment of the court, with opinion.

Chief Justice Garman and Justices Freeman, Thomas, Kilbride, Karmeier, and Burke concurred in the judgment and opinion.

## OPINION

¶ 1    Peoples Gas Light and Coke Company (Peoples Gas) and North Shore Gas Company (North Shore Gas) serve millions of residential and commercial customers in the Chicagoland area. The companies not only sell natural gas, but also deliver it through their lines. Thus, the companies' operating costs include the costs of the gas itself and the costs of the gas distribution. This case involves distribution costs, and a ratemaking proceeding that resulted in a change as to how the companies recover those costs.

¶ 2 The central issue is whether the Illinois Commerce Commission (Commission) abused its discretion when it approved a volume-balancing-adjustment rider, or Rider VBA, which imposed so-called "revenue decoupling" on the companies' customers. In 2008, the Commission approved a similar rider as a four-year pilot program. In 2012, the Commission approved the rider on a permanent basis. The Attorney General and the Citizens Utility Board (CUB) challenged that decision, and the appellate court affirmed it. 2013 IL App (2d) 120243.

¶ 3 For the reasons that follow, we agree with the appellate court and likewise affirm the Commission's decision.

¶ 4                                     BACKGROUND

¶ 5 The Public Utilities Act (Act) opens with a statement of intent:

> "The General Assembly finds that the health, welfare and prosperity of all Illinois citizens require the provision of adequate, efficient, reliable, environmentally safe and least-cost public utility services at prices which accurately reflect the long-term cost of such services and which are equitable to all citizens. It is therefore declared to be the policy of the State that public utilities shall continue to be regulated effectively and comprehensively." 220 ILCS 5/1-102 (West 2010).

One of the stated goals of such regulation is efficiency, or "the provision of reliable energy services at the least possible cost to the citizens of the State." 220 ILCS 5/1-102(a) (West 2010).

¶ 6 The Act creates the Illinois Commerce Commission, the administrative agency responsible for setting rates that public utilities may charge their customers. 220 ILCS 5/2-101 (West 2010); *People ex rel. Hartigan v. Illinois Commerce Comm'n*, 148 Ill. 2d 348, 366 (1992). Under the Act, all rates and charges by public utilities, as well as all rules and regulations pertaining to those charges, must be "just and reasonable." 220 ILCS 5/9-101 (West 2010). A public utility may not alter its rates and charges, unless it provides notice to the Commission and the public by, *inter alia*, filing with the Commission a new "schedule" describing any proposed changes. 220 ILCS 5/9-201(a) (West 2010). When the Commission receives a new schedule, it may conduct "a hearing concerning the propriety" of the changes, and the changes are suspended for some time pending the outcome of that hearing. 220 ILCS 5/9-201(b) (West 2010). The Act further provides:

> "(c) If the Commission enters upon a hearing concerning the propriety of any proposed rate or other charge, classification, contract, practice, rule or regulation, the Commission shall establish the rates or other charges, classifications, contracts, practices, rules or regulations proposed, in whole or in part, or others in lieu thereof, which it shall find to be just and reasonable. In such hearing, the burden of proof to establish the justness and reasonableness of the proposed rates or other charges, classifications, contracts, practices, rules or regulations, in whole and in part, shall be upon the utility. *** No rate or other charge, classification, contract, practice, rule or regulation shall be found just and reasonable unless it is consistent with Sections of this Article." 220 ILCS 5/9-201(c) (West 2010).

¶ 7 In establishing rates, the Commission initially must determine the utility's "revenue requirement." *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n (BPI II)*, 146 Ill. 2d 175, 195 (1991). The Act acknowledges "utilities are allowed a

sufficient return on investment so as to enable them to attract capital in financial markets at competitive rates," and it authorizes public utility rates for various services that "accurately reflect the cost of delivering those services and allow utilities to recover the total costs prudently and reasonably incurred." 220 ILCS 5/1-102(a)(iii), (iv) (West 2010). As we have explained:

> "A public utility is entitled to recover in its rates certain operating costs. A public utility is also entitled to earn a return on its rate base, or the amount of its invested capital; the return is the product of the allowed rate of return and rate base. The sum of those amounts—operating costs and return on rate base—is known as the company's revenue requirement. The components of the ratemaking determination may be expressed in 'the classic ratemaking formula R (revenue requirement) = C (operating costs) + Ir (invested capital or rate base times rate of return on capital).' [Citation.] The same formula is used by the Commission in ratemaking determinations for Illinois." *Citizens Utilities Co. of Illinois v. Illinois Commerce Comm'n*, 124 Ill. 2d 195, 200-01 (1988).

¶ 8       In the context of natural gas, the "C" in that equation, operating costs, includes distribution costs. To some extent, those costs are fixed. Utility companies incur them regardless of the volume of gas that they deliver because they must be prepared to provide adequate, reliable, and safe service. Traditionally, however, volume has played a major role in setting gas rates, and companies have recovered part of their distribution costs through "volumetric distribution charges" based on statistical forecasts of the amount of gas their customers will use. The forecasts, in turn, rest upon several variables, some of which are wildly unpredictable like the weather. Consequently, gas companies have recovered more than their fixed distribution costs when demand for gas has been high, and less than that when it has been low.

¶ 9       In 2007, Peoples Gas and North Shore Gas petitioned the Commission to approve Rider VBA. "A rider is a cost recovery method. It generally alters an otherwise applicable rate and recovers a specific cost under particular circumstances. *** [A rider] often include[s] a reconciliation formula, designed to match revenue recovery with actual costs." *Citizens Utility Board v. Illinois Commerce Comm'n*, 166 Ill. 2d 111, 133 (1995); see *Central Illinois Light Co. v. Illinois Commerce Comm'n*, 255 Ill. App. 3d 876, 883 (1993). Rider VBA was designed with not only revenue recovery, but also revenue disgorgement, in mind. That is, Rider VBA prevents under-recovery of fixed distribution costs, as well as over-recovery of them, by "decoupling" the revenue for those costs that the companies receive from the volume of gas that they deliver. Revenue decoupling essentially maintains a utility company's revenue at or around the revenue requirement. If actual revenues dip below a level set by the Commission due to decreased delivery volume, the company issues customers a surcharge for the difference. If revenues tick above that level due to increased delivery volume, the company issues customers a credit. See Sandy Glatt & Myka Dunkle, *Natural Gas Revenue Decoupling Regulation: Impacts on Industry* (U.S. Dep't of Energy July 2010). That approach removes forecasts, and the inevitable inaccuracies that accompany them, from the calculation of costs and ensures that the company recovers its revenue requirement. Revenue decoupling is not a new approach to ratemaking, but it has garnered increased attention from utilities and regulators, particularly in states concerned with greenhouse gas emissions, because it removes incentives for utilities to deemphasize energy efficiency and to spur demand. *Id.*

¶ 10     The Commission held a hearing on the companies' petition and issued a 320-page order on February 5, 2008, in which it approved Rider VBA as a four-year pilot program with monthly adjustments. See *In re North Shore Gas Co.*, 2008 WL 631214. The Attorney General filed an appeal from the Commission's decision.[1] While that appeal was pending, and time on the pilot program was waning, the companies petitioned to make Rider VBA permanent. The Commission held another hearing and issued a 239-page order on January 12, 2012, in which it approved Rider VBA on a permanent basis.[2] In its order, the Commission set out the positions of the companies, its own staff, and the Attorney General. It then set out its analysis and conclusions. The Commission initially noted that under the pilot program the companies issued refunds totaling more than $28 million. That program was intended to address "the reality of fixed costs against a backdrop of a diminishing customer base and resulting revenue losses as well as revenue losses attributable to the implementation of aggressive energy efficiency programs."

¶ 11     According to the Commission, there were several reasons to make Rider VBA permanent. First, it is "a symmetrical and transparent formula for collecting the approved distribution revenue requirements—not more or less—from customers if the Commission chooses not to provide fully for recovery of fixed costs through fixed charges." Second, Rider VBA reduces reliance on forecasts, which the Commission called "inevitably incorrect each year" and "only correct on average." Relatedly, Rider VBA protects customers if utilities choose a forecast that underestimates sales volumes and yields a higher rate that unjustifiably boosts their revenues and profits. With Rider VBA, such a forecast will not increase profits because any over-collection would be refunded.

¶ 12     The Commission also discussed energy efficiency, noting that was not the sole, or even the main reason to approve the pilot program. Its rationale, instead, was "multi-faceted" and focused on all the benefits offered by revenue decoupling. Decoupling corrects for so-called "load changes," or changes in the volume of natural gas coursing through a utility's lines. Energy efficiency initiatives, including section 8-104 of the Act (220 ILCS 5/8-104 (West 2010)), may result in a diminished load. "Decoupling," observed the Commission, "will take the effects of efficiency into account together with other factors, notably weather, that affects load and promote distribution rate stability for customers and the [companies]."

¶ 13     The Commission stated that the pilot program operated as expected, stabilizing the companies' revenues, while ensuring that customers neither over- nor under-paid the approved revenue requirements. The Commission voiced its support for "increased recovery of fixed costs through fixed charges," but settled on decoupling rather than another alternative rate design. The Commission concluded "there has been a compelling and sufficient showing that a permanent Rider VBA is reasonable and justified."

¶ 14     The Attorney General and CUB filed applications for rehearing. CUB challenged, *inter alia*, the Commission's decision to approve Rider VBA on two grounds. CUB asserted

---

[1]When Rider VBA became permanent, the parties asked the appellate court to dismiss that appeal as moot. That motion was granted. See *People ex rel. Madigan v. Illinois Commerce Comm'n*, No. 2-11-0380 (2012) (minute order).

[2]The Commission also awarded Peoples Gas an 11% increase in its revenue requirement and North Shore Gas a 2.5% increase in its revenue requirement. That portion of the Commission's order is not before us in this appeal.

that the rider was unnecessary because the conditions that justified the pilot program, including higher gas prices and mandated energy efficiency programs that were predicted to lower both demand and delivery volume, no longer exist. CUB further asserted the rider violated a rule developed in case law from this court against so-called single-issue ratemaking. The Attorney General also challenged the Commission's decision on two grounds. Like CUB, the Attorney General asserted that the rider violates the rule against single-issue ratemaking. The Attorney General also asserted that Rider VBA was inconsistent with the regulatory framework established in the Act. See 220 ILCS 5/9-201 (West 2010). Neither the Attorney General nor CUB contended that Rider VBA constituted impermissible retroactive ratemaking. The Commission rejected their arguments, and they sought review by the appellate court. See 220 ILCS 5/10-201(a) (West 2010).

¶ 15     The appellate court affirmed. 2013 IL App (2d) 120243. The Attorney General and CUB generally challenged the validity of Rider VBA, contending that it violates prohibitions against retroactive and single-issue ratemaking. Regarding retroactive ratemaking, the appellate court initially rejected a forfeiture argument raised by the Commission and the companies. *Id.* ¶ 21. The court acknowledged that the Attorney General and CUB failed to raise that issue in their applications for rehearing before the Commission, as required by section 10-113(a) of the Act (220 ILCS 5/10-113(a) (West 2010)) to obtain judicial review of an agency decision, but excused that omission because the issue was addressed by the Commission in its 2008 order and because "forfeiture is a limitation on the parties and not on the jurisdiction of [the] court." 2013 IL App (2d) 120243, ¶ 21. On the merits, the court noted that although rates based on revenue decoupling differ from traditional rates, the legal principles governing them, including the rule against retroactive ratemaking, remain the same. *Id.* ¶ 24. That is, once the Commission approves a ratemaking plan, it cannot later modify that plan to correct an error. *Id.* According to the appellate court, the Commission did not correct any error when it approved Rider VBA. *Id.* "Rather, the Commission approved a design, which involved fixed and reasonable amounts of revenues for the [companies] and which involved a later true-up calculation based on actual sales. This two-tiered design was approved only once by the Commission and was not later modified." *Id.* Thus, the rider did not constitute retroactive ratemaking. *Id.*

¶ 16     Regarding single-issue ratemaking, the appellate court stated that *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 405 Ill. App. 3d 389, 411 (2010), held that riders are by nature methods of single-issue ratemaking, so they are unlawful absent a showing of exceptional circumstances. 2013 IL App (2d) 120243, ¶ 27 (citing *A. Finkl & Sons Co. v. Illinois Commerce Comm'n*, 250 Ill. App. 3d 317, 327 (1993)). The appellate court, however, reemphasized that revenue decoupling is a different rate design from traditional ratemaking, so Rider VBA is unlike the riders discussed in *Commonwealth Edison*. *Id.* ¶ 28. The appellate court declined "to categorically find that Rider VBA is a method of single-issue ratemaking" because it does not isolate or provide for the recovery of any specific cost. *Id.* Instead, the rider accounts for only those costs approved by the Commission as part of its calculation of the revenue requirements. *Id.* The appellate court continued:

> "The Utilities invested significant resources into the critical infrastructure necessary to distribute natural gas to customers' homes and businesses. This investment was approved long ago by the Commission. We conclude that the revenue decoupling mechanism known as Rider VBA was approved by the Commission to

guarantee that the Utilities recoup the costs for the infrastructure in which they prudently invested, not to ensure profits but to satisfy the distribution needs of their customers." *Id.* ¶ 29.

Thus, it did not constitute single-issue ratemaking. *Id.* ¶ 30.

¶ 17 We allowed a petition for leave to appeal from the Attorney General and CUB. Ill. S. Ct. R. 315(a) (eff. July 1, 2013). We also allowed Ameren Illinois Company, American Gas Association, and Northern Illinois Gas Company leave to file separate *amicus curiae* briefs in support of the Commission and the companies. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 18                                                                    ANALYSIS

¶ 19 In this appeal, the Attorney General and CUB raise what they indicate is a sole broad issue: "whether Rider VBA is lawful." They contend it is not for three reasons. First, they argue that Rider VBA departs from "principles of rate-of-return regulation," specifically the principle that a just and reasonable rate under the Act provides only an opportunity for, and not a guarantee of, a profit. Second, they argue that Rider VBA constitutes impermissible single-issue ratemaking. Third, they argue that Rider VBA constitutes impermissible retroactive ratemaking. Before we address these arguments, we must address another argument that bears on them all, the proper standard of review.

¶ 20 The Act governs the Commission (see *People ex rel. Hartigan v. Illinois Commerce Comm'n*, 148 Ill. 2d 348, 366-67 (1992)), but it also governs the courts, and their review of the Commission's decisions. Section 10-201(e)(iv) of the Act provides:

> "(iv) The court shall reverse a Commission rule, regulation, order or decision, in whole or in part, if it finds that:
>
>> A. The findings of the Commission are not supported by substantial evidence based on the entire record of evidence presented to or before the Commission for and against such rule, regulation, order or decision; or
>>
>> B. The rule, regulation, order or decision is without the jurisdiction of the Commission; or
>>
>> C. The rule, regulation, order or decision is in violation of the State or federal constitution or laws; or
>>
>> D. The proceedings or manner by which the Commission considered and decided its rule, regulation, order or decision were in violation of the State or federal constitution or laws, to the prejudice of the appellant." 220 ILCS 5/10-201(e)(iv) (West 2010).

See *Citizens Utility Board v. Illinois Commerce Comm'n*, 166 Ill. 2d 111, 120-21 (1995).

¶ 21 Here, the Attorney General and CUB do not contend that the Commission lacked jurisdiction or violated their constitutional or statutory rights. They also do not argue that the Commission failed to support its decision with substantial evidence. The sole issue before us, then, is simply whether that decision violated the Act.

¶ 22 Section 10-201(d) of the Act states that any decision by the Commission is "prima facie reasonable" (220 ILCS 5/10-201(d) (West 2010)), so a party challenging such a decision bears the burden of proof to show it is unreasonable. Thus, in an appeal like this one, our authority is deferential by statute, but it is also by nature. Simply put, we are judges, not utility regulators.

Though we are free to disagree with the Commission on what the Act means (*Business & Professional People for the Public Interest v. Illinois Commerce Comm'n (BPI I)*, 136 Ill. 2d 192, 204 (1989)), we remain hesitant to disregard how the Commission applies it (see *Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n*, 95 Ill. 2d 142, 152 (1983)). The Commission's interpretation of the Act is accorded deference because administrative agencies enjoy wide latitude in effectuating their statutory functions. *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 398 Ill. App. 3d 510, 514 (2009) (quoting *Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n*, 95 Ill. 2d 142, 152 (1983)); *Alhambra-Grantfork Telephone Co. v. Illinois Commerce Comm'n*, 358 Ill. App. 3d 818, 821 (2005); *cf. Church v. State*, 164 Ill. 2d 153, 161-62 (1995) ("Where the legislature expressly or implicitly delegates to an agency the authority to clarify and define a specific statutory provision, administrative interpretations of such statutory provisions should be given substantial weight unless they are arbitrary, capricious, or manifestly contrary to the statute.").

¶ 23    Deference to the Commission is "especially appropriate in the area of fixing rates." *Iowa-Illinois Gas & Electric Co. v. Illinois Commerce Comm'n*, 19 Ill. 2d 436, 442 (1960); accord *United Cities Gas Co. v. Illinois Commerce Comm'n*, 163 Ill. 2d 1, 12 (1994). As we recognized in *Villages of Milford v. Illinois Commerce Comm'n*, 20 Ill. 2d 556, 561 (1960), "the determination of rates is not a matter of formulas but one of sound business judgment," which the General Assembly has entrusted to the Commission, and not to the courts. See *Cerro Copper Products v. Illinois Commerce Comm'n*, 83 Ill. 2d 364, 371 (1980); *City of Chicago v. Illinois Commerce Comm'n*, 281 Ill. App. 3d 617, 622 (1996) ("Matters of rate regulation are of legislative character and courts should not interfere with the functions and authority of the Commission so long as its order demonstrates sound and lawful analysis."). A rate is more than a number; it is also a design. The Commission's decision in a rate case does not involve simply what utilities may charge their customers, but how they do so. See generally *City of Chicago v. Illinois Commerce Comm'n*, 13 Ill. 2d 607, 611 (1958) ("the statutory authority to approve rate schedules embraces more than the authority to approve rates fixed in terms of dollars and cents"). And that decision depends largely upon the Commission's experience and expertise in its field. See *Central Illinois Public Service Co. v. Illinois Commerce Comm'n*, 243 Ill. App. 3d 421, 445 (1993) ("Because of its complexity and need to apply informed judgment, rate design is uniquely a matter for the Commission's discretion.").

¶ 24    Accordingly, the Attorney General and CUB, as appellants, face an uphill battle to overturn the Commission's 2012 order. Recognizing this, they insist that our review should be nondeferential. They acknowledge that we have held the Commission has discretion to approve riders (see *City of Chicago*, 13 Ill. 2d at 614), but they assert the Commission may exercise that discretion only in "exceptional circumstances" (*Commonwealth Edison*, 405 Ill. App. 3d at 411). They add that where the Commission drastically departs from past practice by violating the Act or its own rules, its decision is entitled to less deference. See *BPI I*, 136 Ill. 2d at 228. They go further, concluding that, because the sole issue here is whether Rider VBA complies with the Act, and that issue involves statutory construction, the Commission's decision is entitled to no deference at all.

¶ 25    We reject these various points. The reference to "exceptional circumstances" in *Commonwealth Edison* has no tether to our case law, and even that court frankly recognized that "the Commission has the power to authorize a rider in a proper case and such authorization will not be reversed absent an abuse of discretion." *Commonwealth Edison*, 405 Ill. App. 3d at

411. Additionally, "only where the Commission departs from its usual rules of decision to reach a different, unexplained result in a single case, thus depriving a party of equal treatment before the Commission, will its decision be entitled to less deference on review." (Internal quotation marks omitted.) *Abbott Laboratories, Inc. v. Illinois Commerce Comm'n*, 289 Ill. App. 3d 705, 715 (1997). The Commission drastically departed from past practice in *BPI I* by disregarding the so-called "test-year rule" contained in the Act and its accompanying regulations. Here, however, there was nothing in the process of approving Rider VBA that violated the Act or any regulations. Finally, the sole issue here does not involve statutory construction. We are not asked to interpret the Act, but rather to judge whether the Commission, in determining that Rider VBA was part of a just and reasonable rate, abused its discretion. On that point, as we have stated, the Commission is entitled to substantial deference. We turn to the main arguments raised by the Attorney General and CUB.

¶ 26                                    1. Rate-of-Return Principles

¶ 27        The Attorney General and CUB first argue that the Commission's decision was contrary to what they call "rate-of-return principles" memorialized in the Act. They assert that Rider VBA, in its attempt to make under-recovery of the companies' revenue requirements less likely, "alters the nature of utility rate-of-return regulation and the concept of 'just and reasonable rates' under the Act." They contend that a just and reasonable rate does not provide a utility with a guarantee of net revenue. See *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944). Rather, such a rate provides the utility with an opportunity for necessary revenue, if properly managed. See *Bluefield Waterworks & Improvement Co. v. Public Service Comm'n*, 262 U.S. 679, 693 (1923).

¶ 28        According to the Attorney General and CUB, a just and reasonable rate under the Act should approximate the rate that would result in a free market. See *Illinois Power Co. v. Illinois Commerce Comm'n*, 339 Ill. App. 3d 425, 434 (2003) (quoting *State Public Utilities Comm'n ex rel. City of Springfield v. Springfield Gas & Electric Co.*, 291 Ill. 209, 218 (1919)). Rider VBA purportedly undermines that approach because it insures a certain level of revenue for the companies, and "includes an assumed profit level," thereby removing any incentive to operate efficiently. They note that if the companies feel that the revenue requirement is insufficient, they can always file a petition for a rate increase under the Act. See 220 ILCS 5/9-201 (West 2010).

¶ 29        We reject this argument for two reasons. The Attorney General and CUB misperceive the purpose of a revenue requirement, and of Rider VBA. Certainly, as the Attorney General and CUB note, the Commission must design and set "just and reasonable" rates for "least-cost public utility services." 220 ILCS 5/1-102 (West 2010). It does this under the rate-of-return principles at the core of the Act, which do attempt to duplicate competition. See also *National Rural Telecom Ass'n v. Federal Communications Comm'n*, 988 F.2d 174, 178 (D.C. Cir. 1993) ("As one virtue of perfect competition is that it drives prices down to cost, rate-of-return regulation seems on its face a promising way to regulate natural monopolies, in principle roughly duplicating the benefits of competition.").

¶ 30        Those principles factor both a recovery of prudent and reasonable costs and a return on equity into the equation used to determine the revenue requirement. See 220 ILCS 5/1-102(a)(iii), (iv) (West 2010); *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n*,

203 Ill. App. 3d 424, 428 (1990) ("The traditional method of setting rates *** begins with the threshold determination of what constitutes a reasonable return on equity (ROE) for the utility; rates are then set at levels designed to produce the target ROE."). If the revenue requirement is "the amount the company is permitted to recover from its customers in the rates it charges" (*Citizens Utilities*, 124 Ill. 2d at 201), the company is entitled to that return. So a rate design that allows a utility company to recover its revenue requirement does not guarantee a profit any more than the revenue requirement itself does.

¶ 31     Further, and more importantly, the Attorney General and CUB conflate the two steps of the ratemaking process. As the companies explain in their brief, the Commission first determines a utility company's revenue requirement, which includes fixed costs and a reasonable return on equity, then designs a rate that allows the company to recover that revenue from its customers as accurately as possible. See *Governor's Office of Consumer Services v. Illinois Commerce Comm'n*, 220 Ill. App. 3d 68, 72 (1991); *Amax Zinc Co. v. Illinois Commerce Comm'n*, 124 Ill. App. 3d 4, 11 (1984). Here, there is no dispute over the Commission's calculation of the revenue requirement. There is only a dispute over the Commission's choice of the mechanism by which the companies recover that figure. And, to repeat, that decision is entitled to substantial deference.

¶ 32     The Commission stated that Rider VBA is a "symmetrical and transparent formula" that, like all rate designs, seeks to accurately collect the revenue requirement. Rider VBA does not ensure net profits or even net revenue; it ensures recovery of the revenue requirement, as determined by the Commission and not challenged by the Attorney General and CUB. Before Rider VBA, the companies recovered their fixed distribution costs through volumetric charges, which meant that the revenue they collected from those charges was either higher or lower than the revenue requirement, depending on how much gas that their customers used. Such a rate design created perverse incentives for the companies to increase demand or under-forecast usage. The former is contrary to section 8-104(a) of the Act. See 220 ILCS 5/8-104(a) (West 2010). The latter is contrary to the Act's goal of least-cost rates. See 220 ILCS 5/1-102(a) (West 2010). Rider VBA accepts the revenue requirement and offers a way for the companies to recover it—no more or less—via the annual true-up calculation. See 2013 IL App (2d) 120243, ¶ 15 ("revenue decoupling allows a rate to fluctuate around a fixed level of revenues"). Under this rider, the amount of revenue that the company can recover is capped, regardless of its actual costs. If those costs increase beyond the amounts used to calculate the revenue requirement, the companies' profits will decrease. Rider VBA does not allow them to earn more than that to which they are already entitled. It does, however, encourage them to manage their business effectively, so the revenue requirement not only covers their costs, but also ultimately provides a reasonable return.

¶ 33     Accordingly, as the Commission noted, the rider was intended to benefit both the companies and their customers. The rider helps the companies bridge the increasingly problematic disconnect between their fixed costs and their revenue losses due to a diminishing customer base and aggressive energy efficiency programs. It also guards the customers against the negative effects of inevitably incorrect forecasting. Decoupling stabilizes both utility revenues and customer bills. The Commission called its rationale "appropriately multi-faceted." See *Cerro Copper*, 83 Ill. 2d at 371 (noting that in designing a rate, "[m]any and complex factors must be considered"). Its decision to approve the rider as "reasonable and justified" was an exercise of sound business judgment, reached after a four-year pilot program

that operated as expected and after a deliberative ratemaking process, in which the views of the companies, the Attorney General and CUB, and its own staff were voiced and considered. The Commission concluded that there was a "compelling and sufficient showing" that Rider VBA was "reasonable and justified." Implicit in that ruling is a belief that the rider comported with the Act and rate-of-return principles. We cannot say that the Commission abused its discretion in approving it.[3]

¶ 34                                    2. Single-Issue Ratemaking

¶ 35       The Attorney General and CUB next argue that the Commission's decision to approve Rider VBA violates the rule against single-issue ratemaking. The Attorney General and CUB insist that riders, which provide direct recovery of unique costs, are a method of single-issue ratemaking, and, consequently, they are impermissible absent a showing of exceptional circumstances.

¶ 36       The rule against single-issue ratemaking is not expressly a part of the Act itself, but instead a creation of our case law. The rule emanates from the revenue formula that we mentioned earlier and:

> "recognizes that the revenue formula is designed to determine the revenue requirement based on the aggregate costs and demand of the utility. Therefore, it would be improper to consider changes to components of the revenue requirement in isolation. Oftentimes a change in one item of the revenue formula is offset by a corresponding change in another component of the formula." (Emphasis omitted.) *BPI II*, 146 Ill. 2d at 244.

Accord *Commonwealth Edison*, 405 Ill. App. 3d at 410 ("The rule ensures that the utility's revenue requirement is based on the utility's aggregate costs and the demand on the utility, rather than on certain specific costs related to a component of its operation." (Emphasis omitted.)). The rule requires that the Commission must examine all the elements of the revenue formula to determine their interaction and the impact any change in one element will have on the utility's revenue requirement. *Citizens Utility Board*, 166 Ill. 2d at 138. Consideration of only one item risks understatement or overstatement of the revenue requirement. *Id.* at 137; *City of Chicago v. Illinois Commerce Comm'n*, 281 Ill. App. 3d 617, 628-29 (1996) ("single issue ratemaking is prohibited because of the danger of ignoring some item which might have an impact on the overall revenue requirement"). Stated differently, an increase in one set of costs cannot alone support a rate increase.

¶ 37       The rule, however, does not apply "except in the context of a complete base rate proceeding," where the Commission must balance costs against other, potentially offsetting changes in a utility's ledger. *Citizens Utility Board*, 166 Ill. 2d at 137; see *Archer-Daniels-Midland Co. v. Illinois Commerce Comm'n*, 184 Ill. 2d 391, 401 (1998). And the rule does not circumscribe the Commission's power to approve recovery of such a cost through a rider when a utility faces unexpected or fluctuating expenses that are difficult to forecast. *Citizens Utility Board*, 166 Ill. 2d at 138; see also *City of Chicago*, 13 Ill. 2d at 614.

---

[3]We note that Illinois is not an outlier on revenue decoupling. According to *amicus* American Gas, there are currently 46 natural gas companies in 21 states, serving 28 million customers, that operate under a rate design involving decoupling.

¶ 38    Here, the Attorney General and CUB largely ignore our statements in *Citizens Utility Board*, and rely instead upon those of the appellate court in *Commonwealth Edison*. There, the court stated, "Because a rider is a method of single-issue ratemaking, by nature, it is not allowed absent a showing of exceptional circumstances." *Commonwealth Edison*, 405 Ill. App. 3d at 411. The appellate court cited *A. Finkl & Sons Co. v. Illinois Commerce Comm'n*, 250 Ill. App. 3d 317, 326 (1993), but that case did not raise the level of scrutiny applied to riders, much less limit the Commission's authority to approve them to instances where exceptional circumstances justify them. Indeed, *A. Finkl* is consistent with *Citizens Utility Board* because it noted that "[r]iders are useful in alleviating the burden imposed upon a utility in meeting *** volatile *** expenses." (Emphasis omitted.) *Id.* at 327; see *Central Illinois*, 255 Ill. App. 3d at 885 ("we do not read *Finkl* as holding that the Commission does not have the authority to allow recovery of costs through riders").

¶ 39    Further, in *Citizens Utility Board*, we did not label riders as methods of single-issue ratemaking. To the contrary, we indicated that they operate differently. Rather than isolating and controlling "a single-expense item" in the revenue formula, a rider "merely facilitates direct recovery of a particular cost, without direct impact on the utility's rate of return." *Citizens Utility Board*, 166 Ill. 2d at 137-38; see also *City of Chicago*, 281 Ill. App. 3d at 629 (stating that the rider was "a reallocation which did not have any impact whatsoever on [the] overall revenue requirement").

¶ 40    The Attorney General and CUB characterize Rider VBA's sole purpose as a way to alter the companies' "actual rate of return." They are incorrect. A utility company's revenue requirement is the sum of its operating costs and its return on equity or rate base. See *Citizens Utilities*, 124 Ill. 2d at 200-01. Its return on rate base is the product of its rate base and its allowed rate of return. *Id.* And its rate of return is set by the Commission at the initial step of the ratemaking process, determining the revenue requirement. Rider VBA has no effect on the companies' rate of return, just like it has no effect on their revenue requirement. As we have stated, Rider VBA accepts the revenue requirement and provides a mechanism to recover it accurately. If the rider has no impact on the revenue requirement, it poses no risk of distorting the ratemaking process. Accordingly, we hold that Rider VBA does not constitute single-issue ratemaking and the Commission did not abuse its discretion in approving it.

¶ 41                              3. Retroactive Ratemaking

¶ 42    Finally, the Attorney General and CUB argue that Rider VBA constituted impermissible retroactive ratemaking. Like the rule against single-issue ratemaking, the rule against retroactive ratemaking is a judicial gloss on the Act. See *Citizens Utilities*, 124 Ill. 2d at 207 ("The prohibition of retroactive ratemaking is derived from the overall scheme of the Act and the role of the Commission in the ratemaking process."). Because rates operate only prospectively (*Hartigan*, 148 Ill. 2d at 396 (citing *Mandel Brothers, Inc. v. Chicago Tunnel Terminal Co.*, 2 Ill. 2d 205, 210 (1954)), we have long held that the Commission may not later correct a rate through a refund or surcharge (*BPI I*, 136 Ill. 2d at 209).

¶ 43    The Commission and the companies respond that because neither the Attorney General nor CUB raised this issue in their applications for rehearing before the Commission, they forfeited review of the issue. We agree.

¶ 44      Under section 10-113(a) of the Act, "No person or corporation in any appeal shall urge or rely upon any grounds not set forth in [an] application for a rehearing before the Commission." 220 ILCS 5/10-113(a) (West 2010). The language of that statute is quite plain: A party to an appeal from a Commission decision may not raise an issue or objection that was not expressly raised in an application for rehearing before the Commission. See *Citizens Utilities*, 124 Ill. 2d at 203-04; *Independent Voters of Illinois v. Illinois Commerce Comm'n*, 117 Ill. 2d 90, 101 (1987) (holding that an issue not raised before the Commission as a ground for rehearing was waived). The purpose of that requirement is to inform the Commission and opposing parties of putative legal and factual errors. *Citizens Utility Board*, 166 Ill. 2d at 135.

¶ 45      Neither the Attorney General nor CUB urged or relied upon the prohibition against retroactive ratemaking in their applications for rehearing below. The Attorney General and CUB ask us to excuse this omission because the Attorney General raised that issue in the application for rehearing in the 2008 case. That is insufficient. Just as section 10-113(a) does not allow a party to an appeal to raise issues by implication (see *id.* at 136), or to substitute a general allegation for a specific one (see *City of Granite City v. Illinois Commerce Comm'n*, 407 Ill. 245, 250 (1950)), it also does not contemplate bootstrapping issues into a current appeal if they were raised at some point in an earlier and separate case.

¶ 46      The appellate court chose to address this argument, noting that forfeiture is a limitation on the parties, and not its own jurisdiction. The appellate court, however, has jurisdiction to review administrative decisions only as provided by statute. Ill. Const. 1970, art. VI, § 6; *Town & Country Utilities, Inc. v. Illinois Pollution Control Board*, 225 Ill. 2d 103, 121-22 (2007). This special statutory jurisdiction is limited to the language of the Act conferring it. *Collinsville Community Unit School District No. 10 v. Regional Board of School Trustees*, 218 Ill. 2d 175, 182 (2006) (quoting *Fredman Brothers Furniture Co. v. Department of Revenue*, 109 Ill. 2d 202, 210 (1985)). Parties seeking to invoke such jurisdiction must strictly comply with the Act. *ESG Watts, Inc. v. Pollution Control Board*, 191 Ill. 2d 26, 30 (2000); see also *Lockett v. Chicago Police Board*, 133 Ill. 2d 349, 353 (1990) ("Since the Administrative Review Law is a departure from common law, the procedures it establishes must be strictly adhered to in order to justify its application."). Because the Attorney General and CUB did not comply with section 10-113(a) of the Act with respect to their retroactive ratemaking argument, they forfeited review of the Commission's decision on that ground. We therefore vacate the appellate court's holding as to retroactive ratemaking.

¶ 47                                  CONCLUSION

¶ 48      For the reasons that we have stated, we affirm the appellate court's decision confirming the Commission's decision to approve Rider VBA on a permanent basis.

¶ 49      Affirmed.