No. 3-06-0879
consolidated with No. 3-07-0569

_____

Filed April 11, 2008

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2008

| | |
|---|---|
| ILLINOIS POWER COMPANY,<br>d/b/a/ AMERENIP,<br><br>    Petitioner-Appellant,<br><br>    v.<br><br>ILLINOIS COMMERCE COMMISSION<br>and DYNEGY, INC.,<br><br>    Respondents-Appellees. | )<br>)<br>) Petition for Review of an<br>) Order of the Illinois<br>) Commerce Commission in<br>) Docket No. 03-0699 and<br>) Docket No. 04-0677.<br>)<br>)<br>)<br>)<br>) |

_____

JUSTICE LYTTON delivered the opinion of the court:
_____

The petitioner, Illinois Power Company, d/b/a AmerenIP (Illinois Power), seek review of two orders issued by the Illinois Commerce Commission (Commission), finding that Illinois Power did not act prudently in remediating deliverability issues at its natural gas storage facility in Hillsboro, Illinois. As a result, the Commission concluded that the costs Illinois Power incurred to obtain natural gas to reinject the field in 2003 and 2004 could not be recovered from its customers. On appeal, Illinois Power argues that (1) the Commission's findings are not supported by substantial evidence in the record, and (2) the Commission improperly applied the prudence standard. We affirm.

I. Commerce Commission Proceedings

This consolidated appeal concerns Illinois Power's Hillsboro natural gas storage facility. The Hillsboro facility is an

underground reservoir that contains two different storage layers. The top layer of the reservoir contains working gas. Working gas is the volume of gas in the reservoir that is injected for storage during the summer months and then withdrawn to be supplied to customers in the winter months. The bottom layer houses base gas which is the volume of gas required to provide adequate pressure to cycle the working gas. Generally, a utility does not remove the base gas from a reservoir field.

Following an expansion project in 1993, Illinois Power began experiencing reduced inventory and deliverability problems at the Hillsboro plant and inadvertently began removing base gas from the field. After years of investigation, the company determined that the problems were caused by improper metering. In 2003, they began reinjecting the field to restore the depleted natural gas inventory. The reinjection process was not completed until the spring of 2004. Pursuant to the Public Utilities Act (Act) (220 ILCS 5/10-201 et seq. (West 2002)), Illinois Power passed $6,879,109 in 2003 and $2,979,849 in 2004 onto its customers in the form of purchase gas adjustment (PGA) tariffs to recover the costs of the reinjection process.

In November of 2003, the Commission commenced reconciliation hearings in accordance with section 9-220 of the Act and directed Illinois Power to present evidence showing its reconciliation of PGA tariff revenues with the actual cost of gas supplies prudently incurred for the 12 month period ending December 31, 2003 (Docket No. 03-0699). One year later, the Commission initiated a second reconciliation proceeding directing Illinois Power to present

2

evidence for the 12 month period ending December 31, 2004 (Docket No. 04-0677). The evidence presented at both proceedings was substantially the same.

Illinois Power engineers and expert witnesses testified that the expansion of the Hillsboro field increased the working gas inventory from 3.1 billion cubic feet (Bcf) to 7.6 Bcf and increased the peak day capacity (the amount of gas to be withdrawn per day) from 50,000 million cubic feet (Mcf) to 125,000 Mcf. The company operated Hillsboro at those levels for the 1993-1994 season. In subsequent winters, however, Illinois Power was unable to withdraw the full amount of gas that had been previously injected into the field.

Given the actions taken to expand the storage reservoir, the possibility existed that the reservoir was physically breached during the expansion process, thereby allowing the newly injected gas to escape or migrate into other areas of the reservoir from which the gas could not be accessed. Other potential causes involved gas migration, gas leaks to the surface, or damage to the intake and withdrawing wells, which would have prevented efficient production of gas inventory. Illinois Power conducted numerous tests in an attempt to determine the cause of the problem. The company was concerned about taking corrective action without first properly identifying the cause of the problem.

The company's experts testified that because of the expansion, it was logical and appropriate to focus initially on a reservoir or structural defect. Thus, Illinois Power decided to pursue an extensive structural investigation beginning in 1997. Illinois

3

Power had a vertical seismic profile of the reservoir field prepared by outside consultants. This study concluded that a more detailed three dimensional seismic analyses was necessary. The preliminary results of the 3-D seismic study indicated that approximately 3.5 Bcf of gas had migrated to another structure northeast of the field. In November 2000, based on the results of this study, Illinois Power drilled a new well but found no substructure below. In light of these inconsistent findings, Illinois Power asked the consultants to reevaluate the 3-D seismic analysis. After collecting additional information and reprocessing the 3-D seismic data, the firm concluded that the additional structure that had been thought to exist to the northeast of the Hillsboro field did not exist. This conclusion was reached in the fall of 2001.

While investigating the possibility of structural causes or reservoir problems, Illinois Power also retained Peterson Engineering to conduct an audit of the metering instruments at Hillsboro. Peterson was retained in August of 1999 and issued its finding in December of 1999. In its report, Peterson identified two problems with the Hillsboro meters. First, two new turbine injection meters were over-registering gas volumes under certain operating conditions. Specifically, when the nearby plant compressors operated at certain levels, they caused the meters to over-spin, thereby recording a greater amount of gas as having been injected than was actually passing through the meter. The turbine meter over-registration was calculated to be 26% when the compressors were operating at 50% but only 1.7% when the

4

compressors were operating at 100% loadings. Second, the orifice meter on one of the four withdrawal wells had an opening that was smaller than the size value stamped on the orifice plate. The diameter stamped on the plate was 10% larger than its actual diameter. This meant that less gas was being withdrawn from the field that had been believed. In basic terms, there was less gas going in and less gas coming out than the meters were indicating.

According to Illinois Power, the amount of error on the withdrawal meter could be easily calculated based on the different sized orifice measurements. However, the company maintained that the injection meter over-registration could not be as easily determined. Illinois Power attempted to calculate the loss by estimating when the compressors were operating at certain levels. Using this estimation method, Illinois Power initially determined that the two metering errors offset each other. It was subsequently discovered that the injection metering error was much larger than the withdrawal metering error. Illinois Power made several meter operating corrections to the facility to eliminate both meter measurement error. These changes were implemented in May 2000.

In early spring 2003, Illinois Power conducted another exhaustive set of structural analyses of the reservoir, including (1) neutron log analyses, (2) flame ionization surveys, (3) field metering versus plant metering comparisons, (4) reservoir performance tests, and (5) volumetric analyses. These tests indicated that the working gas and base gas volumes in the Hillsboro field had been significantly depleted over time due to

the injection metering problem.

As a result, Illinois Power developed an estimate of the total gas inventory shortfall that had resulted from the metering error and created a plan to reinject gas to restore the Hillsboro base gas volume and working gas volume to the original post-expansion amounts. Illinois Power commenced reinjection in the spring of 2003.

Commission Staff presented evidence in response to Illinois Power's position. Eric Lounsberry, an engineer in the engineering department of the Commission's energy division, testified that the information available to Illinois Power in 1999 pointed to metering errors as the most likely cause of the deliverability problems. Lounsberry stated that if Illinois Power had used existing information and available well data, it would have discovered that an inventory shortfall was the primary problem.

First, Lounsberry testified that Illinois Power was aware of problems with its storage field metering equipment as early as 1996 and was also aware of similar deliverability issues at another Illinois Power field, the Shanghai storage field. The Peterson study noted that the company was aware in 1996 that computed volumes from the plant metering and well metering instruments had not been satisfactorily reconciled at Hillsboro or the Shanghai plant. Lounsberry stated that these two similar situations indicated that Illinois Power's ability to identify the root cause of the problem was inadequate.

Second, Lounsberry asserted that the 1994 well data from the intake/withdrawal wells at Hillsboro could have been accurately

6

extrapolated and would have quickly determined that the intake metering error was much larger than the withdrawal error. He testified that Illinois Power had actually integrated some of the daily well measurement to calculate the volume of gas injected and that the company could have used that data to integrate all of the measurements between 1994 and 1999. He stated that the integrated volume measurements would have been more accurate than the estimation method used by Illinois Power and would have immediately alerted the company that the injection meter error was the source of the deliverability issue. Lounsberry concluded that if Illinois Power had conducted a more thorough review of the metering issues after the Peterson study was completed, it would have discovered the true magnitude of the injection metering error and could have started replacing the gas in the Hillsboro field during the 2000 season.

## II. The Commission Orders

The Commission issued orders finding Illinois Power's actions imprudent in both cases. In docket No. 03-0699, the Commission defined prudence as "that standard of care which a reasonable person would be expected to exercise under the same circumstances encountered by utility management at the time decisions had to be made." Applying this standard, the Commission determined that the delay in discovering the meter error and Illinois Power's decision to delay reinjecting the Hillsboro storage field were imprudent. The Commission agreed with the Staff's assessment that Illinois Power should have started replacing the inventory in the Hillsboro field during the 2000 season.

7

The Commission was also persuaded that the Staff's "overall storage concerns" were indications that Illinois Power was less than prudent at the Hillsboro site.  The Commission order provided:

"In the Commission's view, [Illinois Power] imprudently selected the easy path when it discovered there might be a problem at Hillsboro.  It appears that with inadequate thought, [Illinois Power] decided the problems at Hillsboro must be structural and began hiring consultants to identify the exact nature of the problem.  This followed the ineffective pattern established for the Shanghai Storage Field. *** [C]learly something is amiss in [Illinois Power's] operations and management of storage fields."

In conclusion, the Commission held that Illinois Power was imprudent in its operation of the Hillsboro field because it "(1) failed to conduct a thorough study of the injection error at the time it was identified, (2) failed to conduct any inspections to assure that the orifice meters were working properly, [and] (3) failed to begin returning the inventory to the field when the working gas volumes fell below the pre-expansion volume of 3.1 Bcf after the 1999-2000 winter season."  Consequently, the Commission ruled that $6,870,109 of incurred costs related to Illinois Power's remediation of the Hillsboro depleted gas levels could not be recovered from its customers through PGA tariffs.

The order in docket No. 04-0677 reiterated most of the findings contained in the 2003 case.  Based on the evidence adduced at the 2004 hearings and premised upon the Commission's order

8

entered in docket No. 03-0699, the Commission found that Illinois Power imprudently incurred $2,979,849 in additional gas costs in 2004.

## III.   STANDARD OF REVIEW

An appellate court's jurisdiction of direct appeals from the Commission is governed by section 10-201 of the Act (220 ILCS 5/10-201 (West 2002)).  Section 10-201(e)(iv) states that we may only reverse a Commission order if we conclude that "[t]he findings of the Commission are not supported by substantial evidence based on the entire record of evidence presented to or before the Commission for and against such *** order."  220 ILCS 5/10-201(e)(iv) (West 2002).  The Commission's findings of fact are to be accepted as prima facie true.  Business and Professional People for Public Interest v. Illinois Commerce Comm'n, 146 Ill. 2d 175 (1991); 220 ILCS 5/10-201(d) (West 2002).  Merely showing that the evidence presented would support a different conclusion than the one reached by the Commission is not sufficient.  Rather, the appellant must affirmatively demonstrate that the opposite conclusion is "clearly evident."  Continental Mobile Telephone Co. v. Illinois Commerce Comm'n, 269 Ill. App. 3d 161 (1994).

## IV.  ANALYSIS

The General Assembly allows utilities to recover their gas cost directly from the consumer through purchase gas adjustments (PGA) clauses.  See 220 ILCS 5/9-220 (West 2002).  The Act clearly places upon those utilities taking advantage of a PGA clause the burden of proving the prudence of their gas purchases during the course of yearly reconciliation proceedings.  220 ILCS 5/9-220

9

(West 2002).  Prudence is not defined within the Act.  Commerce Commission proceedings and our court have defined prudence as "that standard of care which a reasonable person would be expected to exercise under the same circumstances encountered by utility management at the time decisions had to be made."  Illinois Commerce Comm'n v. Commonwealth Edison Co., Docket No. 84-0395, p. 17 (1987); Illinois Power Co. v. Commerce Comm'n, 339 Ill. App. 3d 425, 428 (2003).  In determining whether a judgment was prudently made, only those facts available at the time judgment was exercised can be considered.  Illinois Power Co. v. Commerce Comm'n, 245 Ill. App. 3d 367 (1993).

## A.

Illinois Power claims that the Commission's order should be reversed because the record demonstrates that it met the imposed burden by showing that the gas costs it incurred in 2003 and 2004 as a result of the reduction of the withdrawal capacity were prudent.  First, Illinois Power argues that substantial evidence in the record shows that its decisions and actions were reasonable when made based on the information known to management at the time. Second, Illinois Power claims that to begin reinjecting replacement gas into Hillsboro in 2000, when the company was still investigating structural and geological issues, would have been imprudent.  Finally, Illinois Power complains that the order must be reversed because the Commission's prudence determination was based, in part, on unsupported concerns at the Shanghai storage facility.

The Commission's findings of fact are to be accepted as prima

10

facie true, and the burden of proof on all issues raised on appeal is on the party appealing the Commission's order. See Business and Professional People, 146 Ill. 2d 175 (1991); see also 220 ILCS 5/10-201(d) (West 2002). Here, nothing in the record in docket No. 03-0699 or docket No. 04-0677 demonstrates that an opposite conclusion is clearly evident.

Initially, the record indicates that Illinois Power failed to promptly pursue potential metering problems that were plainly stated and thoroughly analyzed in the 1999 Peterson report. The Peterson study further noted that the company was aware in 1996 that computed volumes from the facility metering and well metering had not been satisfactorily reconciled since 1994. At that time, Illinois Power was also aware of injection metering instrument errors at the Shanghai station.

Evidence further indicated that Illinois Power had accurate injection well data from 1994. That information could have been integrated to determine an accurate estimate of the total amount of gas that had been injected into the field between 1994 and 1999. Illinois Power claims that all of the data from those years had not been extrapolated and was therefore unrealiable. However, no one on behalf of Illinois Power testified that it would have been unduly burdensome to integrate the data to use as a comparison. As a means of verification, the data was available and was sufficiently reliable. In addition, Illinois Power neglected to use those years for which it actually had integrated values. Given the extent to which it tested the structural integrity of the reservoir, it seems unreasonable to have ignored the 1994 well data

11

as a means of testing the metering measurements of the reservoir. In light of these facts, the Commission's decision that Illinois Power acted imprudently based on the information known to the company at the time is sufficiently supported by the records.

Next, we disagree with Illinois Power's assertion that it would have been imprudent to reinject the field with natural gas inventory in 2000 when working gas volumes fell below pre-expansion levels. The record demonstrates that Illinois Power pursued the potential structural and geological issues vigorously beginning in 1996 and even repeated and reassessed numerous geological tests based on their assumption that the problem was caused by the structural identity of the reservoir. However, beginning in 1999, several reports and analyses indicated that the deliverability issue was caused by a field metering error rather than a structural one. Thus, the Staff claimed that once Illinois Power corrected the metering errors in 2000, testing those corrections during the 2000 injection season would have been appropriate. Lounsberry's testimony showed that many, if not most, of Illinois Power's concerns with reinjecting the field too soon were unfounded based on a review of the 1999 Petersen report and the inconsistent 3-D seismic data on hand. Thus, the Commission position that Illinois Power should have attempted to reinject the field in 2000 to test the metering corrections is not unreasonable. By waiting three more years before even attempting to begin replacement efforts, Illinois Power unnecessarily depleted the base gas volumes of the reservoir and exponentially increased the cost of injection. Based on the entire record in both proceedings, a conclusion that

12

Illinois Power was prudent is not clearly evident.

Last, we find that the Commission properly considered the deliverability issues at Illinois Power's Shanghai storage facility. We noted that the Act does not prohibit the Commission from considering power utilities' actions beyond the specific conduct in question. See 220 ILCS 5/9-201 et seq. (West 2002). Thus, when the Staff provided testimony of a similar metering error that arose at the Shanghai field, the Commission did not err in reviewing those "concerns" in its decision. Further, we believe Commission consideration was appropriate based on the similar deliverability issues in the Shanghai case.

In Illinois Commerce Comm'n v. Illinois Power Co., Docket No. 01-0701, 2004 Ill. Puc Lexis 101 (2004), the Commission filed a reconciliation proceeding involving Illinois Power's Shanghai field for the year ending in December of 2001. As in this case, there was a deliverability issue which was eventually associated with an injection metering problem. The error in that case caused Illinois Power to withdraw approximately 743,313 Mcf of natural gas above the meter indications. The error existed from 1995 until it was identified in January 2000. In that case, the Commission found that Illinois Power's actions "were not imprudent." The decision in that case indicates that by early 2000, Illinois Power had discovered a metering error was the cause of the company withdrawing 20.6% more gas above what its meters reflected from the Shanghai storage field.

While the Commission was unwilling to find Illinois Power's conduct at the Shanghai facility imprudent in 2001, the issue here

13

is whether Illinois Power acted prudently by reserving its decision to reinject the Hillsboro field until the summer of 2003. Here, by early 2000, Illinois Power had not only the information from the Peterson study regarding metering problems at Hillsboro, but the knowledge that there had been nearly identical metering problems at Shanghai. This information, coupled with the information from the well chart data, would have allowed Illinois Power to calculate the magnitude of the metering problems in 2000 to the extent necessary to begin reinjection much in advance of the 2003-2004 season. In essence, the metering error identified at the Shanghai field in 2000 undercuts the argument that it was prudent for Illinois Power to concentrate its investigation on structural as opposed to metering causes beyond the 2000 injection season. Thus, the "overall concerns" presented by the Staff were properly utilized as additional support for the Commission's finding of imprudence.

B.

Illinois Power also asks us to consider the Commission's application of the prudence standard. Illinois Power maintains that the Commission created an "after-the-fact" standard of care that a reasonable person should have followed in 2000 when deciding whether to reinject the Hillsboro field. We disagree.

The Commission has stated that in utility cases the prudence standard conforms to the dictionary definition of prudence. Business & Professional People for the Public Interest v. Commerce Comm'n, 279 Ill. App. 3d 824 (1996). In Business & Professional People, the court noted that prudence is commonly defined as "skill or good judgment in the use of resources." 279 Ill. App. 3d at 831

14

(citing Webster's Ninth Collegiate Dictionary 949 (1985)).  When we apply the prudence standard, only those facts available at the time judgment was exercised can be considered, and imprudence cannot be sustained by substituting one's judgment for that of another. <u>Illinois Power Co.</u>, 339 Ill. App. 3d at 428.

As discussed, the record suggests that the Peterson report presented a clear indication that the deliverability issues at Hillsboro were due to injection metering problems.  That report was issued in the fall of 1999.  Illinois Power took the necessary actions in 2000 and corrected the metering issues outlined in the report.  Thus, the Staff's position that Illinois Power could have reinjected the field as early as 2000 is based on facts available to Illinois Power in 2000.  Accordingly, the Commission's decision that it was imprudent to wait to reinject the field for three more years is not based on an after-the-fact record.  It is  supported by substantial evidence in the record dating back to 1996 and is based on information known to Illinois Power during the 2000 injection season.

## V.  CONCLUSION

For the above reasons, we affirm the Commission finding that Illinois Power's decision to forego reinjecting the Hillsboro storage field until 2003 was imprudent.  The Commission orders in case No. 03-699 and case No. 04-677 are therefore affirmed.

No. 3-06-879 -- Affirmed.

No. 3-07-569 -- Affirmed.

CARTER, J., and MCDADE, PJ., concurring.

15