NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230388-U

Order filed November 25, 2024

_____

| | | |
|---|---|---|
| NORTHERN ILLINOIS GAS COMPANY,<br>d/b/a Nicor Gas Company, | ) <br> ) <br> ) | Petition for Review of Orders of the<br>Illinois Commerce Commission. |
| Petitioner-Appellant, | ) <br> ) | |
| v. | ) <br> ) | ICC Docket No. 20-0330<br>Appeal No. 3-23-0388 |
| THE ILLINOIS COMMERCE<br>COMMISSION and PEOPLE OF THE<br>STATE OF ILLINOIS *ex rel.* KWAME<br>RAOUL, ATTORNEY GENERAL OF<br>THE STATE OF ILLINOIS, | ) <br> ) <br> ) <br> ) <br> ) <br> ) | |
| Respondents-Appellees. | ) | |

_____

JUSTICE HETTEL delivered the judgment of the court.
Justices Peterson and Albrecht concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:  Substantial evidence supported Commission's findings that public utility's additional expenses were not prudently incurred and therefore not recoverable under qualified investment plant provisions of the Public Utilities Act. However, prudently incurred environmental costs should have been allowed.

¶ 2     Petitioner, Northern Illinois Gas Company, doing business as Nicor Gas Company (Nicor), seeks review of an order issued by the Illinois Commerce Commission (Commission) finding certain costs incurred by Nicor for capital investments in its gas distribution system to be imprudent and unreasonable. As a result, the Commission disallowed recovery of $32 million in overrun costs, concluding those expenses could not be recovered from Nicor's customers under

article 9 of the Public Utilities Act. On appeal, Nicor argues that the Commission's findings of imprudence are based on improper hindsight analysis and not supported by substantial evidence in the record. For the following reasons, we affirm in part and reverse in part, and remand for further proceedings.

¶ 3                                    I. BACKGROUND

¶ 4                    A. The Public Utilities Act and Qualified Investment Plant Costs

¶ 5        Under the Public Utilities Act (Act) (220 ILCS 5/9-101 *et seq*. (West 2022)), the Commission reviews rates proposed by public utilities to ensure that they are "just and reasonable." 220 ILCS 5/9-201(c) (West 2022). Section 9-201 of the Act addresses rate changes and provides that the utility bears the burden of proof. *Id*.

¶ 6        In 2013, the General Assembly enacted section 9-220.3 of the Act to encourage public gas utilities, such as Nicor, to invest in their infrastructure to improve the safety and reliability of their systems. Public Act 98-57, § 5 (eff. July 5, 2013); see also 220 ILCS 5/9-220.3(a) (West 2022).[1] The statute created a rider mechanism for natural gas delivery services to recover "Qualified Investment Plant" (QIP) expenses through a monthly surcharge, including the installation and replacement of underground natural gas facilities, the replacement of facilities prone to leakage, and the installation and replacement of regulator stations and equipment. See 220 ILCS 5/9-220.3(b)(1)-(7)) (West 2022).

¶ 7        At the end of each year, the utility must file a petition with the Commission in which the utility reconciles its annual QIP costs. *Id.* § 9-220.3(e)(2). This process allows the Commission to review a utility's expenses and confirm that they are recoverable under the statute. *Id.* A utility

---

[1] Section 9-220.3 was repealed by its own terms effective December 31, 2023.

may only recuperate "actual prudently incurred costs" of "qualifying infrastructure investment" for the preceding year. *Id.*

¶ 8                                    B. Reconciliation Proceedings on Nicor's 2019 QIP

¶ 9            In 2019, Nicor filed a petition (2019 QIP) providing its planned investments for the year. Eleven months later, Nicor submitted its reconciliation schedule, with supporting testimony, seeking to recover approximately $414.6 million in additional costs incurred on 213 projects between January 1, 2019, and December 31, 2019. The Attorney General partially objected to the petition and claimed that the expenses incurred in nine of those projects were imprudent, requesting a total disallowance of approximately $40.3 million.

¶ 10           The Commission conducted reconciliation proceedings and admitted into evidence testimony and exhibits from Nicor, Commission Staff, and the Attorney General. At the conclusion of the proceedings, the Commission disallowed $32 million of the $414.6 million in additional costs reported in several projects, including: (1) Aux Sable Phase 7B, (2) Aux Sable Phase 8, (3) Group 2, (4) Ancona, (5) Troy Grove Sands, (6) Sycamore Station, and (7) Arlington Heights Main Replacement. Two primary witnesses testified regarding the projects in question: (1) Patrick E. Whiteside, Nicor's Vice President of Gas Business Support; and (2) the Attorney General's expert witness, Sebastian Coppola, president of Corporate Analytics, Inc.[2] We will discuss each project, and the witnesses' relevant testimony, in turn.

¶ 11                                        1. *Aux Sable Phase 7B & Phase 8*

---

[2] The Attorney General provided an exhibit of Coppola's qualifications, detailing Coppola's experience as an independent consultant for energy businesses for nearly 20 years and his prior 27-year employment in the industry as the senior vice president and chief financial officer of SEMCO Energy, MCN Energy, and MichCon Gas Co., where he served as the financial officer and strategic planner for storage and pipeline operations.

¶ 12        The Aux Sable pipeline is a 34-mile high-pressure transmission main, supplying natural gas to Nicor customers in the Chicago area. Whiteside testified that, beginning in 2004, Nicor's inspections revealed significant corrosion of the protective coating on the pipes, to the extent that the coating had "disbonded," or separated from the pipe, in several locations. As a result, Nicor identified the Aux Sable line as a "higher risk" pipeline that needed to be replaced. In 2019, Nicor completed the last two phases of the Aux Sable replacement project—Phase 7B and Phase 8— installing new sections of pipe running parallel to the existing pipeline and modifying two stations located in direct proximity to the line.

¶ 13        Phase 7B of the Aux Sable project replaced two miles of pipeline, a portion of which crossed a railroad right-of-way (ROW) owned by Wisconsin Central Ltd., doing business as CN (CN). In 2017, a train derailment spurred a ROW dispute with CN in which the railway refused to allow Nicor access to work on the line underneath CN property. The dispute continued through 2019. Nicor and CN did not reach an agreement until 2020. Whiteside testified that because Nicor could not replace the pipeline in Phase 7B in 2019 as originally planned, it created an alternate plan to work around CN's property. Nicor then executed three change orders to tie the new pipeline into the existing pipeline that crossed under the ROW. These orders increased the project's original cost by $14 million.

¶ 14        Coppola, testifying as the Attorney General's expert witness, disputed Whiteside's claim that the Aux Sable line was "higher risk." He testified that there was no evidence that the existing pipeline posed an imminent threat that required immediate replacement before the parties reached a settlement in the ROW dispute. Given that the section of pipeline was the last section scheduled for replacement in a multi-year plan, he believed that any pipeline integrity issues in Phase 7B were lower than previous phases of the project. Coppola further claimed that Nicor failed to present

4

evidence that the change orders represented a reasonable and prudent solution to resolving the permit issues. He noted that Nicor offered no evidence that the Phase 7B section of pipeline was at "near-term risk" to warrant proceeding with the phase. Moreover, Nicor did not provide any details from pipeline inspections or other engineering calculations indicating that Phase 7B "could not wait a year or two[.]" (E. 1093-94). Coppola found no evidence that the Phase 7B section had "any significantly high anomalies that required immediate replacement." He opined that "[a] delay to replace this segment of the pipeline until the ROW access issue was resolved would not appear to pose any significant incremental risk to the public, but it would have avoided more than $14 million of unnecessary costs."

¶ 15        The Commission found that Nicor knew of the ROW access issues beginning in 2017 and that by 2019 Nicor knew or should have known that CN would continue to deny access. It determined that Nicor's decision to work around the ROW at a cost of $14 million was unreasonable and imprudent given the lack of evidence reflecting an immediate or near-term threat to the pipeline or a significant risk to the public. Based on these findings, the Commission disallowed the Aux Sable Phase 7B change order costs of $14,221,563.

¶ 16        Phase 8 of the Aux Sable project required replacement of approximately 1,100 feet of pipeline and modification of two stations nearby. Whiteside testified that Phase 8 represented the end of the Aux Sable project, resulting in the completion of replacing the entire line. Due to the close proximity of the pipelines in Phase 7 and Phase 8, Nicor chose to use the same contractor for Phase 8 as it had selected for Phase 7, without using a competitive bidding process. Whiteside testified that the discovery of "severe" pitting on the pipes required an accelerated repair schedule for Phase 8. He noted that the bidding process takes three or more months and Nicor had

insufficient time to bid the work out. Using the same contractor avoided move-on and move-off charges for two different crews.

¶ 17 Whiteside further testified that after work began on Phase 8, the scope of the project increased, resulting in additional costs. Precision Pipeline, LLC (Precision), the contractor working on Phases 7 and 8, experienced unforeseen field conditions due to excess ground water and scheduling delays related to depressurizing the pipeline. Precision used a subcontractor to dewater the area around the pipeline. The use of a subcontractor was permissible under the terms of the Nicor/Precision contract but caused project cost increases. Precision also had trouble isolating and depressurizing the pipeline, which required the use of additional supports, tools, and valve assemblies, resulting in additional expense.

¶ 18 Coppola testified that no evidence supported Whiteside's claim that the proximity of Phases 7 and 8 would have resulted in more expensive projects if Nicor used separate contractors, noting that the cost per mile nearly tripled from $16.5 million for Phase 7B to $46.3 million for Phase 8 using the same contractor. He maintained that Nicor should have started the bidding process for Phase 8 in conjunction with the bidding process for Phase 7 in anticipation of final phase completion. Coppola further testified that Nicor was imprudent in entering into a contract that permitted the pipeline contractor to use subcontractors, potentially at cost increases, without competitive bidding. He further claimed that Nicor's explanation for the delay in purging the pipeline showed that Precision failed to have the proper cutting tools and failed to properly and timely identify the escaping gas.

¶ 19 The Commission found that Nicor was imprudent in failing to tender Phase 8 for competitive bidding and failing to "record or to locate, other facilities in the immediate vicinity of a critical transmission pipeline and its own stations." It also identified areas where Precision

performed deficiently and incurred unreasonable costs. The Commission decided that the cost overruns were imprudently incurred and disallowed $3.3 million in additional expenditures for the Phase 8 project. The Commission further concluded that Nicor failed to present sufficient evidence of its due diligence to ensure Phase 8 was prudently performed and therefore could not reasonably shift the additional costs of Precision's deficient performance to ratepayers.

¶ 20                                    2. *Group 2 Projects*

¶ 21        Nicor's Group 2 projects consist of 26 projects from the 2019 QIP involving main installations, line repairs, and piping retirement works that were completed with cost overruns ranging from 20% to 160%. In response to discovery requested by the Attorney General for explanations of each project's cost variance and the related dollar amount, Nicor provided a table listing the 26 projects and identifying the variances with brief explanations. For example, the table listed the QIP Geneva project with a 160.4% cost variance (projected cost of $61,899 versus actual cost of $161,202.91) and explained the variance as "[m]ain installation costs higher than QIP plan due to additional excavation volumes required discovered during construction." Nicor listed similar explanations for the other 25 projects.

¶ 22        Coppola accepted some of the cost variances but contested the additional costs for 13 of the 26 projects. Coppola testified that Nicor's explanations were insufficient and that Nicor knew or should have known of the circumstances that caused the overruns when it designed the projects and prepared the cost estimates.

¶ 23        To support recovery of these additional costs, Whiteside testified in his surrebuttal that cost estimates were only one tool Nicor used to control expenses and some project costs "evolve over time" based on new information. Whiteside explained that the budget estimates for gas construction projects typically represent information available at the time that the plans are

submitted and do not reflect subsequent, unforeseen project changes. Nicor provided no other details for the challenged costs.

¶ 24　　　　After reviewing the parties' arguments and the discovery exhibits, the Commission found that Nicor failed to provide sufficient evidence to justify the cost variances on the contested projects and disallowed $10.6 million in additional costs in Group 2. In doing so, the Commission emphasized that Nicor bore the burden of persuasion to establish that the costs were justified and failed to reach that bar. Specifically, it held that "without additional information to justify the cost overruns ***, the Commission cannot determine if the costs to ratepayers were prudent and reasonably incurred."

¶ 25　　　　　　　　　　　　　3. *Additional Contested Projects*

¶ 26　　　　The Attorney General contested the cost overruns on four additional projects in Group 1. Whiteside testified that the Ancona project was part of Nicor's storage field gathering lines rehabilitation program, which repaired gas transmission lines leading to storage facilities. Nicor replaced a 16-inch diameter pipeline in the Ancona project at a cost overrun of 116%. Whiteside testified that much of the additional expense was due to hard-rock excavation and the discovery of an old saline pit and piping. He admitted that Nicor knew about the saline pit during project design but stated that it was not aware of the location of the pit liner or how far the liner extended.

¶ 27　　　　Coppola claimed that Nicor knew of available engineering methods to ascertain the extent of the pit liner at the time the project was designed but chose not to use those methods. He further testified that Nicor was responsible for having proper records of the location of its facilities on its property but failed to maintain accurate records of the saline pit and liner, resulting in revisions to the design during construction and additional costs.

¶ 28     The Commission agreed that it was Nicor's responsibility to maintain sufficient and accurate records and rejected Nicor's assertion that the additional costs would have been incurred regardless of its knowledge of the location and extent of the liner. The Commission found that Nicor could have avoided cost overruns associated with stopping excavation, shifting the line around the pit, and bringing new equipment and material onsite during construction. It concluded that $2.38 million of additional costs on the Ancona project were imprudently incurred and disallowed them.

¶ 29     The Troy Grove Sand storage field has an unusual configuration with multiple natural gas gathering systems that use the same pipe corridor, some of which required repair and some of which were previously retired. Whiteside explained that while Nicor was aware that it had retired piping in the vicinity of the repair area, it did not know the exact location of the piping or whether it would be encountered during construction. Costs increased further when, during the repair process, more extensive vacuum excavation was required to protect buried facilities.

¶ 30     Coppola testified that Nicor's failure to maintain proper records of the retired piping was another example of poor recordkeeping. Referring to the additional vacuum excavation, he explained that Nicor's failure to predict actual field conditions and develop accurate project designs and cost estimates caused the site contractors to depart from their firm bid price and request compensation on a time and material basis.

¶ 31     The Commission found no evidence to support Nicor's contention that the additional project costs would have been the same if it had known the piping's location, noting again Nicor's responsibility to maintain records of its abandoned and retired facilities. It further found that the failure to design and estimate project costs for the additional vacuum excavation resulted in a lack of coordination between Nicor engineers and operating personnel and caused cost overruns. It

concluded that Nicor imprudently commenced repair of the Troy Grove Sand line without a proper project design and disallowed $553,343 in cost overruns.

¶ 32    The Sycamore Station project was similar in design to the Troy Grover Sand project, involving pipeline repair. Whiteside testified that Nicor experienced cost overruns at Sycamore Station when construction time increased from 10 to 30 days due to the discovery of several unknown buried lines. He asserted that the lines were not previously identified because they had been abandoned years ago. Whiteside further testified that the cost overruns included expenses for vacuum excavation and environmental remediation measures that were not discovered until construction, and which would have been incurred even if identified at the time of project design. Specifically, in response to the Attorney General's tenth request for data, Whiteside explained that the environmental analysis of a pipeline heater cannot be performed until it is decommissioned, causing the extent of remediation to be unknown at the design phase. Nicor provided additional evidence in response to AG 10.39 (a), a data request table, by adding an expense column which listed the additional cost for environmental remediation of the heater that was decommissioned during the Sycamore Station project as $16,000.

¶ 33    Again, Coppola testified that Nicor's failure to maintain accurate records of the location of retired and abandoned pipes on its property resulted in using additional vacuum excavation that was imprudent and unreasonable. The Commission agreed and concluded that, as with the Troy Grove project, Nicor was neither prudent nor reasonable in commencing construction without accounting for the location of retired and abandoned piping on its own property. As to the overruns for environmental mitigation, the Commission recognized that the costs "could only be determined upon excavation while in the field" but emphasized that it was Nicor's burden to prove that the additional costs were prudent and found that Nicor failed to provide sufficient detail of the

10

environmental costs to make "disaggregated disallowances." Consequently, the Commission disallowed all the cost overruns for the Sycamore Station project, totaling $248,346.

¶ 34    As part of the Arlington Heights Main Replacement project, Nicor repaved and landscaped around the facility and sought to recover those costs in the 2019 Rider QIP. Coppola rebutted Nicor's evidence that project expense increases were prudently incurred and attested that costs increased because Nicor's failed to coordinate with the Village of Arlington Heights and businesses in the area and failed to properly estimate the cost of the project.

¶ 35    In his surrebuttal testimony, Whiteside explained that most of the cost overruns for the Arlington Heights project were related to unanticipated landscaping and paving repair costs. Those costs exceeded the projected estimates because salt damage was discovered during the removal of brick pavers, requiring replacement of the pavers rather than reinstallation.

¶ 36    In denying the additional costs of $533,317 for the Arlington Heights Main Replacement project, the Commission emphasized the deficiency of Nicor's evidence to support those costs, stating that "the record does not establish any effort to coordinate with the municipality to look for options that would share the costs of replacing brick pavers and keep costs to ratepayers reasonable." The Commission found that Nicor imprudently incurred the cost overruns due to poor project design and coordination with the village and local businesses and failed to provide evidence that additional material and labor costs would have been the same with better project design.

¶ 37                    C. Commission's Final Ruling

¶ 38    Ultimately, the Commission entered a 112-page order disallowing $32 million in additional costs related to Nicor's 2019 QIP reconciliation schedule and subsequently denied Nicor's application for rehearing. Nicor appeals, claiming the Commission's decision was inconsistent with the prudence burden of proof and unsupported by substantial evidence.

11

¶ 39                                                    II. ANALYSIS

¶ 40                                              A. Standard of Review

¶ 41         Initially, we find it necessary to clarify the standard of review in this case. Nicor contends

that we should apply a *de novo* standard to the Commission's decision that the costs were not

prudent and lacked sufficient evidence. In response, both the Commission and the Attorney

General argue that, while Commission rulings that involve statutory interpretation are reviewed *de*

*novo*, decisions regarding the determination of prudent expenses and whether a utility has satisfied

its burden of proof are reviewed under the "substantial-evidence" or manifest-weight-of-the-

evidence standard.

¶ 42         A Commission decision is entitled to "great deference because it is the judgment of a

tribunal appointed by law and informed by experience." *United Cities Gas Co. v. Illinois*

*Commerce Comm'n*, 163 Ill. 2d 1, 12 (1994). Deference is particularly appropriate in cases

involving the fixing of rates. *People ex rel. Madigan v. Illinois Commerce Comm'n*, 2015 IL

116005, ¶ 23. As our supreme court emphasized in *Madigan*:

       "A rate is more than a number; it is also a design. The Commission's decision in a rate case

       does not involve simply what utilities may charge their customers, but how they do so.

       [Citation.] And that decision depends largely upon the Commission's experience and

       expertise in its field." *Id.*

¶ 43         The deferential standard and scope of appellate review of Commission orders is governed

by section 10-201 of the Act. 220 ILCS 5/10-201 (West 2022). The Commission's findings of fact

are considered *prima facie* true, and its orders are reviewed as *prima facie* reasonable. *Id.* § 201(d).

Section 201(e) provides that we may only reverse a Commission order if the Commission's

findings "are not supported by substantial evidence" based on the entire record, the Commission

12

lacked jurisdiction, or the Commission's order or proceedings violate state or federal laws. *Id.* § 201(e)(iv).

¶ 44 In this case, Nicor challenges the Commission's factual findings that its 2019 QIP expenses were imprudently incurred. Thus, Nicor bears the burden of showing that the order was not supported by "substantial evidence." Id. § 201(e)(iv)(A). The substantial-evidence standard is the same as the manifest-weight standard. *Save Our Illinois Land v. Illinois Commerce Comm'n*, 2022 IL App (4th) 210008, ¶ 37; see also *Ameren Illinois Co. v. Illinois Commerce Comm'n*, 2013 IL App (4th) 121008, ¶ 18 (noting that substantial evidence requires more than a scintilla but less than a preponderance of evidence). Merely showing that the evidence presented would support a different conclusion than the one reached by the Commission is not sufficient. *Illinois Power Co. v. Illinois Commerce Comm'n*, 382 Ill. App. 3d 195, 201 (2008). Rather, the appellant must affirmatively demonstrate that the opposite conclusion is " 'clearly evident.' " *Id.* (quoting *Continental Mobile Telephone Co. v. Illinois Commerce Comm'n*, 269 Ill. App. 3d 161, 171 (1994)). We will not disturb the Commission's finding if "a reasoning mind would accept [the evidence] as sufficient" to support the Commission's conclusion. *Central Illinois Public Service Co. v. Illinois Commerce Comm'n*, 268 Ill. App. 3d 471, 479 (1994).

¶ 45 On administrative review, it is not our job to reevaluate witness credibility, reweigh the evidence, or substitute our judgment for that of the Commission's. *Commonwealth Edison v. Illinois Commerce Comm'n*, 405 Ill. App. 3d 389, 398 (2010). Moreover, past ratemaking precedent is not controlling in determining the propriety of subsequent Commission decisions. See *Citizens Utility Board v. Illinois Commerce Comm'n*, 166 Ill. 2d 111, 125 (1995); *Ameren Illinois Co. v. Illinois Commerce Comm'n*, 2012 IL App (4th) 100962, ¶ 72. It is well-settled that the Commission " 'is not a judicial body, and its orders are not *res judicata* in later proceedings before

13

it.' " *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2016 IL 118129, ¶ 24 (quoting *Mississippi River Fuel Corp. v. Illinois Commerce Comm'n*, 1 Ill. 2d 509, 513 (1953)). Rather, the Commission has the power to deal with each situation as it is presented, regardless of how it may have ruled on the same or a similar situation in past proceedings. *Id.*

¶ 46                                    B. "Prudently Incurred" Standard

¶ 47          In reconciliation proceedings, utilities have the burden of proving that the costs incurred for "qualifying infrastructure investment" are "prudently incurred." 220 ILCS 5/9-220(e)(2) (West 2022). The parties do not dispute that the projects in this case meet the definition of a "qualifying infrastructure investment." The question on appeal is whether Nicor provided sufficient evidence demonstrating that its costs associated with certain QIP projects were reasonable and "prudently incurred."

¶ 48          "Prudence is that standard of care which a reasonable person would be expected to exercise under the same circumstances encountered by utility management at the time decisions had to be made." *Illinois Power Co. v. Illinois Commerce Comm'n*, 339 Ill. App. 3d 425, 428 (2003) (*Illinois Power Co. II*). A utility's reconciliation petition "shall include testimony and schedules that support the accuracy and prudence of the qualifying infrastructure investment for the calendar year being reconciled." 220 ILCS 5/9-220(e)(2) (West 2022). In considering whether a design decision was prudently made, "only those facts available at the time judgment was exercised can be considered." *Illinois Power Co. II*, 339 Ill. App. 3d at 428 (citing *Illinois Power Co. v. Illinois Commerce Comm'n*, 245 Ill. App. 3d 367, 371 (1993)). A utility's prudence should not be assessed based on hindsight. *Id.*

¶ 49                                    C. Aux Sable Phase 7B Project

14

¶ 50 First, Nicor challenges the Commission's decision that the costs related to the Aux Sable Phase 7B project were not prudent. Nicor claims the evidence was unrebutted that immediate repairs to the Phase 7B line were necessary and the Commission engaged in improper hindsight analysis in concluding that the additional costs for the project were imprudently incurred.

¶ 51 The crux of Nicor's argument regarding the necessity of repairs is that the Commission erred by not crediting Whiteside's claim that Nicor could not delay the project because of concerns about the pipeline's integrity. As the Commission's order recognized, however, Coppola testified that Nicor provided no evidence of an immediate or near-term threat to the existing section of pipeline or any significant incremental risk to the public if Nicor delayed the project. While Whiteside asserted that the pipeline's condition put the Aux Sable line in the higher risk category, Nicor provided no evidence from any in-line inspection or other subsurface engineering analysis to support his claim that replacement of one of the last phases of the line could not wait until the ROW dispute was resolved. After reviewing the witnesses' competing testimony, the Commission found Coppola's explanation to be more credible. On administrative review, we decline to reevaluate that credibility determination or reweigh the evidence.

¶ 52 Nicor also challenges the Commission's determination that its decision to work around the ROW issue with CN was imprudent. It claims that the Commission's finding that Nicor should have waited for a resolution with CN assumes fact not known to Nicor in 2019, resulting in an impermissible "hindsight analysis" under *Illinois Power Co. II*, and conflicts with the Commission's approval of a work-around design in 2018. We disagree for several reasons.

¶ 53 First, a complete reading of the Commission's finding of imprudence regarding the Phase 7B project demonstrates that the Commission did not assess Nicor's prudence based on hindsight. Instead, it applied the facts available at the time Nicor exercised its judgment and rejected Nicor's

15

claim that the work-around costs were prudent based on an imminent pipeline failure. Nicor's acknowledgement that CN would not grant access to the ROW until their dispute was resolved neither proved an imminent risk in 2019 nor indicated that a resolution was unlikely. Given the absence of any evidence of an immediate and urgent safety risk regarding the 7B Phase line, the Commission appropriately concluded that Nicor "imprudently" decided to proceed with a costly work-around design rather than wait until the dispute could be resolved.

¶ 54        Second, the Fifth District's decision in *Illinois Power Co. II* is distinguishable. In that case, the Commission found that Illinois Power was imprudent in retiring a propane plant in 2002 because the utility failed to conduct an economic analysis (PVRR analysis) that the Commission had not required utilities to use in prior cases involving similar plant retirements. *Illinois Power Co. II*, 339 Ill. App. 3d at 438-439. The reviewing court concluded that the Commission's finding of imprudence was erroneously based on hindsight rather than substantial evidence available to the utility at the time the decision was made. *Id.* at 439. In rejecting the Commission's decision, the court held that by evaluating the prudence of the utility's actions under the PVRR analysis "the Commission created *after the fact* the standard of care a reasonable person should have followed." (Emphasis in original.) *Id.* at 439-40. Here, the Commission did not apply a new economic analysis or a new legal standard to Nicor's decision after the fact. The Commission found, based on evaluating the facts available to Nicor at the time the decision was made, that Nicor's choice to proceed with the work-around project in 2019 was imprudent.

¶ 55        Finally, the Commission's prior decision to allow recovery of cost overruns for Nicor's work-around design in 2018 does not signify that the Commission's determination that a similar design in 2019 was imprudent should be overturned. The Commission is permitted to deal with issues freely, even when it considers issues similar or identical to those considered in previous

cases. See *Ameren Illinois Co.*, 2012 IL App (4th) 100962, ¶¶ 72-76. Thus, we find no error in the Commission's decision to distinguish its prior order. CN's ongoing dispute and refusal to provide access to that section of the pipeline in 2017 and 2018 showed that by 2019, Nicor knew, or at least should have known, that CN would continue to deny access to the ROW until the dispute was resolved. Given Nicor's awareness of the ongoing negotiations, Nicor's 2019 QIP should have accounted for those potential delay needs. Accordingly, based on the entire record, Nicor's position that it was prudent in pursuing the costly 2019 work-around for the CN dispute rather than delaying the project was not clearly evident. The Commission's finding that the additional expense of $14.2 million was imprudently incurred was supported by substantial evidence and is therefore affirmed. See *Ameren Illinois Co*, 2013 IL App (4th) 121008, ¶ 18 (Commission's "substantial evidence" standard requires more than a scintilla but less than a preponderance of evidence).

¶ 56                                    D. Group 2 Project

¶ 57        Next, Nicor contends that the Commission erred in determining that the additional expenses related to the Group 2 projects were not prudently incurred costs. Nicor claims that the Commission's disallowance of $10.6 million in costs for the Group 2 projects was contrary to settled law establishing a utility's burden of proof and urges us to reverse the Commission's decision.

¶ 58        The Act establishes that a utility bears the initial burden of proof to establish that costs were prudently incurred. 220 ILCS 5/9-201(c) (West 2022). "Once a utility makes a showing of the costs necessary to provide service under its proposed charges, it has established a *prima facie* case, and '[t]he burden then shifts to others to show that the costs incurred by the utility are unreasonable because of inefficiency or bad faith.' " *Apple Canyon Lake Property Owners' Ass'n*

*v. Illinois Commerce Comm'n*, 2013 IL App (3d) 100832, ¶ 54 (quoting *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n*, 327 Ill. App. 3d 768, 776 (2002)).

¶ 59　　In this case, we agree with Nicor that, once it submitted its additional cost schedule under the 2019 QIP, it made a *prima facie* case supporting the additional costs. The burden then shifted to the Attorney General, as the objecting party, to show that the costs incurred by Nicor were imprudent and unreasonable. However, after reviewing the exhibits and the testimony of the witnesses, we conclude that there was sufficient evidentiary support for the Commission's decision that additional costs incurred in 13 of the 26 projects within Group 2 were not prudent or reasonable.

¶ 60　　The Attorney General provided expert testimony to rebut the additional costs. Coppola, a consultant specializing in financial and strategic issues in energy and utility regulation with over 46 years of experience, had appropriate knowledge and expertise to testify regarding the insufficiency of Nicor's cost support. Among other findings, Coppola testified that Nicor's cost overruns were alarmingly high, with at least half of the projects in Group 2 reporting a 50% variance from the cost originally budgeted. The chart Nicor submitted in support of its cost increases lacked a site-specific explanation for the costs and, when challenged, Nicor failed to provide further details denoting the additional expenses.

¶ 61　　The Commission weighed the testimony and supporting evidence and adopted Coppola's findings that the costs in 13 of the Group 2 projects were imprudently and unreasonably incurred and disallowed $10.6 million in additional project expenditures. Since the Commission's findings are not contrary to the manifest weight of the evidence, we will not disturb the disallowance of additional costs in Group 2.

¶ 62　　　　　　　　E. Aux Sable Phase 8 Project and the Ancona Project

18

¶ 63     Similarly, Nicor challenges the disallowance of costs associated with the Aux Sable Phase 8 project and the Ancona project. Nicor claims the Commission's order was incorrect as a matter of law and unsupported by substantial evidence for three reasons: (1) the Commission improperly analyzed its decision to use the Phase 7B contractor for the final Phase 8 project rather than seeking competitive bids; (2) the Commission's finding that the costs were imprudent because Nicor failed to record and locate facilities near the project was against the manifest weight of the evidence; and (3) the Commission's findings that additional costs on the Phase 8 project caused by Precision's deficient performance are unsupported by the record; and (4) the Commission erred in applying hindsight review to the additional saline-liner costs on the Ancona project.

¶ 64     First, we conclude that the Commission's findings were supported by substantial evidence and were not against the manifest weight of the evidence. The Commission disallowed $3.3 million in costs related to the Phase 8 project, finding that (1) Nicor's failure to bid the project out and record and locate other facilities in the immediate vicinity was imprudent, and (2) Precision's performance at the job site culminated in a 40% cost overrun that was unreasonable and imprudent. While Nicor did present evidence as to why they did not use the competitive bidding process for Phase 8, Coppola's testimony that the cost per mile nearly tripled from $16.5 million for Phase 7B to $46.3 million for Phase 8 supports the Commission's finding that Nicor's failure to do so was not prudent. Coppola's testimony that Nicor could have, and most likely should have, bid the project out when it submitted Phase 7B for bids also bolsters the Commission's finding of imprudence. Coppola indicated that given their close proximity to each other, a reasonable person in Nicor's position would have bid Phase 8 out during the competitive bidding process on the nearby Phase 7B project. His testimony, when viewing the entire record, indicates that the Commission's disallowance is supported by substantial evidence of imprudence.

19

¶ 65 Moreover, the Commission's finding that Nicor's failure to record the location of underground pipelines surrounding its preexisting facilities was imprudent was plainly established in the record and corroborated by Coppola's testimony. Several exhibits further demonstrated that Nicor's lack of records on facilities that are no longer in use resulted in significant cost increases on numerous projects.

¶ 66 As for Precision's performance, the record supports the Commission's finding that the contractor's failure to have the appropriate tools, coupled with the lack of location records, resulted in additional costs. As the Commission noted, Precision failed to properly set a sealing element twice with equipment that the contractor should have had on site. Again, Coppola's testimony supports the Commission's finding. Coppola questioned these additional costs and rebutted Nicor's conclusory statement that neither the company nor the contractor could anticipate the condition of the pipe or estimate replacement costs with any meaningful accuracy. Coppola also testified that Precision failed to spot escaping gas in a timely manner, leading to increases in labor and material. As a whole, the evidence supports the Commission's determination that the costs incurred on the Phase 8 project, above those originally budgeted in the 2019 QIP, were imprudent.

¶ 67 Likewise, substantial evidence supports the Commission's finding that Nicor imprudently incurred $2.38 million of the $3.3 million in cost overruns on the Ancona project. Evidence showed that Nicor did not have sufficient or accurate records on the extent of the saline liner. Additionally, Coppola testified that there were multiple engineering methods available to Nicor to identify the subsurface pit liner prior to the design phase, but Nicor did not avail itself of those methods. Coppola summarized that, as a result, Nicor engaged in costly onsite design changes to reroute the replacement piping, resulting in additional labor and equipment costs. Nicor cites to Whiteside's testimony that the company only discovered the extended location of the liner after construction

20

began to support its claim that the Commission engaged in impermissible hindsight analysis. This ignores the underlying cause that precipitated the costly change orders—Nicor's failure maintain accurate records of its own facilities.

¶ 68 In rebuttal, Nicor cites Whiteside's assertions of prudence and reasonableness on both projects to overturn the Commission's decision. However, Nicor ignores Coppola's testimony to the contrary, as well as our purview on appeal. The Commission was not required to credit Whiteside's reasoning for failing to locate old pipelines and facilities or his rationale for the contractor's delayed and deficient performance. Further, on review, we should refrain from reweighing the conflicting expert testimony and substituting our judgment for the judgment of the tribunal charged with implementing the tariff. See *Commonwealth Edison*, 405 Ill. App. 3d at 398 (appellate court should refrain from reevaluating witness credibility, reweighing the evidence, or substitute its judgment for the Commission's). After reviewing the voluminous transcripts and exhibits from the reconciliation proceedings, we cannot say the Commission's decision to disallow $3.3 million in costs on the Phase 8 project was against the manifest weight of the evidence.

¶ 69                                    F. Remaining Projects

¶ 70 Finally, Nicor claims the record fails to support the Commission's decision that it acted imprudently on the remaining projects in Group 1. Specifically, Nicor contends the Commission's findings fail to support the extent of its disallowances on the remaining projects, citing Whiteside's testimony that Nicor would have incurred the same cost overruns regardless of its knowledge of the underground location of the pipelines and facilities.

¶ 71 We should affirm the Commission's findings unless the appellant demonstrates that they were unsupported by "substantial evidence" and the opposite conclusion is "clearly evident." See

*Illinois Power Co.*, 382 Ill. App. 3d at 201. Here, Nicor failed to meet that burden as to all but one of the remaining projects.

¶ 72        Regarding the Troy Grove Sands project, substantial evidence supported the Commission's decision to disallow $553,343 of cost overruns because Nicor was neither prudent nor reasonable in commencing construction without being fully apprised of the location of retired and abandoned facilities. The record shows that these additional costs arose from the removal of previously retired piping and the need, as a result, to use more expensive vacuum excavation.

¶ 73        At the Sycamore Station, Nicor incurred an additional $248, 346 in costs. Coppola testified that these overruns arose from the delayed construction related to the discovery of several buried lines and the resulting vacuum excavation. In disallowing the additional costs, the Commission recognized that the costs were not incurred solely due to the buried lines but were also caused by necessary environmental testing of an abandoned line heater, stating in part:

> "The Commission does note that the additional environmental measures that were required could only be determined upon excavation while in the field and are not the result of incomplete or inaccurate records. However, the record does not detail the task costs in a way that allows the Commission to make disaggregated disallowances."

¶ 74        Having reviewed the Attorney General's tenth request for data and the exhibits submitted in response, we conclude that the record belies the Commission's finding that Nicor failed to provide sufficient detail regarding the environmental cost component to allow a disaggregated disallowance. In Nicor's discovery response, Whiteside specifically identified the cost of environmental remediation incurred in removing the Sycamore Station pipeline heater and listed a separate factor for environmental testing. Moreover, Nicor's revised cost variance explanation in response to the Attorney General's data request provided that Nicor underestimated "the

environment costs association with the decommissioning and disposal of the existing line heater" and listed an additional amount for those costs of $16,000. The Commission cannot disallow a cost if the weight of the evidence does not support a finding of imprudence. See 220 ILCS 5/9-220.3(e)(2) (West 2022) (where "testimony and schedules that support accuracy and prudence of qualifying infrastructure investment" are included in utility's petition, costs are eligible for recovery under the tariff); *id.* § 10-201(e)(iv)(A) (Commission's order will be reversed if it is unsupported by "substantial evidence"). Here, the exhibits establish that these additional expenses were prudently incurred environmental costs. Thus, the Commission's disallowance of $16,000 for the environmental remediation of the Sycamore Station heater is reversed. We remand to the Commission with directions to enter an amended order revising the disallowance calculation and the corresponding 2019 QIP investments eligible for recovery under the tariff. See *id.* § 9-220.3 (a), (b) (natural gas utility may "file a tariff for a surcharge" for "costs associated with investments in qualifying infrastructure plant" projects, including retiring and replacing underground facilities).

¶ 75 Finally, on the Arlington Heights Main Replacement project, the Commission disallowed an additional $533,317 in expenditures. Coppola testified that Nicor failed to coordinate landscape design and material needs with the village and the local businesses. In response, Nicor did not provide evidence to support its suggestion that these changes and additional design needs could not have been avoided with better project designs. Again, we find sufficient evidence to support the Commission's finding of imprudence.

¶ 76 In sum, Nicor claims that multiple factors influenced the cost increases in these remaining three projects and those factors would have applied regardless of Nicor's pre-construction knowledge of the location of their facilities or the need for additional supplies. However, Coppola

testified that, in all three instances, Nicor imprudently failed to maintain adequate records of its own retired and abandoned lines and facilities and failed to design the projects in anticipation of reasonable material needs. As previously discussed, except as to the environmental costs associated with the Sycamore Station project, the Commission accepted Coppola's challenge to the prudency of those expenses in light of Nicor's knowledge at the time the decision was made, and we are in no position to reassess credibility or reweigh the testimony. Moreover, the Commission was free to reject Whiteside's explanation that those costs would have been incurred regardless of Nicor's knowledge where evidence in the record suggested otherwise.

¶ 77                                III. CONCLUSION

¶ 78        For the reasons stated, we reverse the order of the Illinois Commerce Commission disallowing $16,000 in environmental costs on the Sycamore Station project and remand for further proceedings as discussed herein. The Commission's order is affirmed in all other respects.

¶ 79        Affirmed in part and reversed in part; cause remanded.